UNITED STATES of America, Appellee,

v.

Leonard David GRIFFIN, Appellant.

No. 90–5290MN.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1990.

Decided Dec. 28, 1990.

Daniel M. Scott, Minneapolis, Minn., for appellant.

Nathan P. Petterson, Minneapolis, Minn., for appellee.

Before ARNOLD and MAGILL, Circuit Judges, and BATTEY,* District Judge.

BATTEY, District Judge.

Leonard David Griffin (Griffin) appeals from a final judgment entered in the District Court for the District of Minnesota. Griffin entered a conditional plea of guilty to one count of armed bank robbery, in violation of Title 18, United States Code, Sections 2113(a) and 2113(d) and one count of use of a firearm "during and in relation to" a crime of violence in violation of Title 18, United States Code, Section 924(c)(1).

Griffin moved the district court to suppress inculpatory statements made to agents of the Federal Bureau of Investigation (F.B.I.) during questioning at his home because the interrogating agents failed to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The district court referred the matter to the Honorable Bernard P. Becker, United States Magistrate, pursuant to the provisions of 28 U.S.C. § 636. The district court considered the matter *de novo*, adopted the findings and

conclusions of the magistrate, and denied the motion on the ground that Griffin was not in custody for purposes of *Miranda* at the time the statements were made. Griffin appeals the district court's denial of the motion to suppress. We reverse and remand the case for trial.

## I

## FACTS

On February 25, 1989, the Twin Cities Federal Savings and Loan Association (TCF) was robbed by two men armed with a shotgun and possibly a handgun. One of the robbers, a black male, vaulted the teller counter and collected the money while his accomplice, a white male, stood near the entrance of the bank with the shotgun. A shotgun, two jackets, and a hat were found outside the bank after the robbery. In the ensuing investigation, F.B.I. agents Richard Waldie and Fred Tremper learned that shortly after the robbery, a Yellow Cab had picked up a single, black male, with no coat or jacket, in the vicinity of TCF who was taken to the Normandy Inn Hotel in downtown Minneapolis. The passenger told the cab driver to wait outside while he went upstairs to Room 461 in order to obtain the cab fare.

Acting on this lead the F.B.I. interviewed the hotel clerk and learned that the room had been rented to a woman named Carol Brewer. A search of the wastebasket in the room turned up a business card from Charles Bennett, a car salesman for Lupient Buick in Minneapolis. Bennett informed the F.B.I. agents that Brewer and a white male named Mark Chapman had taken a dark red Mazda RX–7 sportscar for a test drive the day of the robbery. Brewer and Chapman had not returned the car, so Bennett initiated his own investigation to determine the whereabouts of the vehicle. Through his investigation Bennett spoke with Chapman's wife, Jeanine Chapman, who provided Bennett with a photo of Chapman. The F.B.I. placed this photo in a

* The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

photo array which was shown to the clerk at the Normandy Hotel. The hotel clerk identified Chapman as a person connected with Room 461 on the date of the robbery. In addition, the F.B.I. established that a car bearing a description similar to the stolen Mazda RX-7 had been seen in a parking lot near the scene of the robbery.

Pursuing the investigation on March 1, 1989, the F.B.I. interviewed Chapman's wife, who provided information about an associate of her husband, appellant Griffin, whom she knew as Junior Iron Moccasin. Mrs. Chapman's description of Griffin fit the description of the TCF robber who had vaulted the counter and collected the money. She provided the agents with Griffin's address and phone number.

Possessing this information, the F.B.I. agents suspected that Griffin was connected with the robbery and they decided to speak with him. The agents called the telephone number provided by Chapman's wife to arrange an interview. Griffin's stepfather answered the phone and informed the agents that Griffin would be home early that evening. Agents Waldie and Tremper proceeded to Griffin's home, arriving at 7 p.m., and were invited into the living room by Griffin's stepfather. The purpose of the interview was to determine what Griffin knew of the bank robbery. The officers did not intend to arrest him at that time. The agents waited in the living room until 8:15 p.m. when Griffin was heard approaching the house outside. The agents moved to the hall near the front door to meet Griffin as he entered the house. Waldie and Tremper identified themselves as F.B.I. agents investigating a bank robbery and informed Griffin that they needed to speak with him. At that point, before any other words were spoken, Griffin stated, "The gun wasn't loaded."

The agents explained to Griffin's parents that it was necessary for them to speak to Griffin in private and, accordingly, the three went into the dining room and sat down. The agents did not draw their guns,

handcuff Griffin, or place him under formal arrest. Griffin's parents retired to the upstairs of the house where they remained throughout the course of the questioning.

Neither of the agents informed Griffin that he was not under arrest, that he was free to request the agents to leave without speaking to them, nor did they inform him of his *Miranda* rights. Twice during the two-hour interview Griffin asked to obtain cigarettes from other places in the house and each time Agent Waldie required that Agent Tremper escort him. Griffin was told he was to stay in their view at all times. The agents used this procedure to ensure their personal safety because a weapon had been used in the course of the robbery, although this was not explained to Griffin at the time.

During the interview, Griffin appeared nervous, "sort of choked up for words" and "fearful" of the agents. In the course of the questioning Griffin implicated himself and Chapman in the robbery. The agents questioned Griffin for approximately two hours. At the conclusion of the interview the agents placed Griffin under arrest. Griffin was then transported to the F.B.I. office where, three hours after his initial confrontation with the agents, he was advised of his *Miranda* rights for the first time.

Defendant Leonard David Griffin and co-defendant Mark John Chapman were indicted in a four-count indictment alleging the crime of robbery of a federally insured savings and loan institution through use of force and violence, in violation of 18 U.S.C. §§ 2113(a) and (d) (Count I); conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371 (Count II); the use of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1) (Count III); and possession of a firearm by a convicted felon, namely Mark John Chapman, in violation of 18 U.S.C. §§ 922(g) and 924(a)(1)(B) (Count IV). Griffin's conditional plea was to Count I and Count III.[1]

---

**1.** Federal Rule of Criminal Procedure 11(a)(2) permits a defendant to enter a conditional plea of guilty, reserving the right to appeal the ad-

verse determination of any specific pretrial motion, such as a motion to suppress. A defendant

## II

## DISCUSSION

### A. General

The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning. *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612. The *Miranda* court undertook a lengthy examination of the physical and psychological interrogation practices employed by law enforcement authorities during the custodial interrogation of criminal suspects and concluded that, absent the procedural safeguard of an adequate warning, those practices involve inherently coercive pressures which compel an individual to make self-incriminating statements. *Miranda*, 384 U.S. at 439, 86 S.Ct. at 1609. *Miranda* accordingly requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued *prior to questioning* whenever a suspect is (1) interrogated (2) while in custody.[2] Custody determinations are obviously mixed questions of law and fact which require that the entire circumstances of the particular case be carefully assessed. *Carter*, 884 F.2d at 371. It is undisputed that Griffin was being interrogated within the meaning of the *Miranda* rule. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980) (interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect). Thus, in examining whether *Miranda* has application to this case, the court must examine whether or not the interrogation of Griffin was custodial. The court finds that this was a custodial interrogation.

### B. In Custody

■ Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144–45, 82 L.Ed.2d 317 (1984).[3] In determining whether a suspect is "in custody" at a particular time we examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a "reasonable person in the suspect's position would have understood his situation" to be one of custody. *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151; *United States v. Carter*, 884 F.2d 368, 370 (8th Cir.1989). If Griffin believed his freedom of action had been curtailed to a "degree associated with formal arrest," and that belief was reasonable from an objective viewpoint, then Griffin was being held in custody during the interrogation. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150. The determination of custody arises from an examination of the totality of the circumstances. *Carter*, 884 F.2d at 370, *citing*, *United States v. Lanier*, 838 F.2d 281, 285 (8th Cir.1988) (per curiam).

### C. Standard of Review

■ A district court's conclusions concerning custody are reviewed under the "clearly erroneous" standard and the cir-

who prevails on appeal shall be allowed to withdraw the plea.

2. In fashioning the now-familiar *Miranda* warnings the Supreme Court looked to the then-existing departmental practice of the F.B.I. of providing a warning to criminal suspects. The Court noted that the "[t]he standard warning long given by Special Agents of the F.B.I. to both *suspects* and persons under arrest is that the person has a right to say nothing and a right to counsel, and that any statement he does make may be used against him in court." *Miranda*,

384 U.S. at 484, 86 S.Ct. at 1633 (emphasis added). The Court made the F.B.I. procedure a rule of general application to law enforcement at all levels saying "[t]he practice of the F.B.I. can readily be emulated by state and local enforcement agencies." *Miranda*, 384 U.S. at 484, 86 S.Ct. at 1633.

3. The formality of an arrest is not a prerequisite to a finding of custodial interrogation. *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985); *United States v. Longbehn*, 850 F.2d 450, 452 (8th Cir.1988).

cuit court "must affirm unless the decision of the district court is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or in light of the entire record we are left with a firm and definite conviction that a mistake has been made." *United States v. Jorgensen*, 871 F.2d 725, 728 (8th Cir.1989) (clearly erroneous standard applies to motions to suppress; custody issue reviewed along with other issues); *United States v. O'Connell*, 841 F.2d 1408, 1414 (8th Cir. 1988); *United States v. Ross*, 713 F.2d 389, 392 (8th Cir.1983).

### D. Relevant Factors

Previous decisions of this court have stated that the relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation. *Lanier*, 838 F.2d at 284; *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir.1985); *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir.1988). While the accused's freedom of action during the interrogation remains a critical factor, the purpose, place and length factors have been interpreted to have inconclusive, independent relevance to the determination of custody.

### E. Purpose

 It is insufficient to render an interrogation custodial that the purpose of the interrogation is to obtain potentially inculpatory information from a suspect that has become the focus of the investigation. *Beckwith v. United States*, 425 U.S. 341, 345, 96 S.Ct. 1612, 1615, 48 L.Ed.2d 1 (1976); *United States v. Jones*, 630 F.2d 613, 615 (8th Cir.1980). Although custody is not inferred from the mere circumstance that the police are questioning the one whom they believe to be guilty, the fact that the individual has become the focus of the investigation is relevant "to the extent that the suspect is aware of the evidence against him" and this awareness contributes to the suspect's sense of custody. *Carter*, 884 F.2d at 370. In any event, the fact that the purpose of the questioning is to further focus the investigation on the

defendant "does not weigh heavily in [the] analysis." *Carter*, 884 F.2d at 370, *quoting*, *United States v. Jimenez*, 602 F.2d 139, 145 (7th Cir.1979).

### F. Place

 The place of the interrogation, while relevant, has not developed as a determinative factor in custody analysis. *Miranda* tended to focus on the coercive aspects of the stationhouse interrogation, but subsequent authority indicates that deprivations of freedom may occur in places other than the police station. *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (suspect in custody when questioned at home); *United States v. Mahar*, 801 F.2d 1477, 1500 (6th Cir. 1986) (suspect in custody when questioned at place of employment); *United States v. Beraun–Panez*, 812 F.2d 578, 582, *as amended* 830 F.2d 127, 127–28 (9th Cir. 1987) (suspect in custody when questioned on isolated range near where he was herding cattle). Conversely, interrogation which occurs at the police station or jailhouse may be non-custodial. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (suspect not in custody even though questioned at police station); *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (prisoner questioned during incarceration for offense of false claims not in custody for purposes of interrogation concerning separate offense of tax evasion); *United States v. Jorgensen*, 871 F.2d 725 (8th Cir.1989) (suspect not in custody when questioned at F.B.I. offices).

### G. Length

 The length of the interrogation has been a similarly undeterminative factor in the analysis of custody. While *Miranda* was most obviously concerned with the "marathon" routine of questioning a suspect, custody has been found in relatively brief interrogations where the questioning is of a sort where "the detainee is aware that questioning will continue until he provides his interrogators the answers they seek." *Berkemer*, 468 U.S. at 439, 104

S.Ct. at 3149; *Beraun–Panez*, 812 F.2d at 579 (questioning of suspect for approximately one hour together with other circumstances indicated custody); *Mahar*, 801 F.2d at 1500 (questioning of suspect for only twenty minutes at place of employment custodial in light of other indicia of custody); *Davis v. Allsbrooks*, 778 F.2d 168 (4th Cir.1985) (no custody though questioning occurred over the course of several hours where other circumstances demonstrated lack of restraint on suspect).

### H. Indicia of Custody

A consistent line of inquiry has developed from this case-by-case approach which has identified several common indicia of custody. These indicia of custody relate to the specific police practices employed during questioning which tend to either mitigate or aggravate an atmosphere of custodial interrogation. This inquiry into the indicia of custody has generally focused on an examination of (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

While the foregoing list is decidedly non-exhaustive, the presence or absence of these particular indicia of custody have been influential in this court's assessment of the totality of the circumstances surrounding an official interrogation. The first three of these factors may be fairly characterized as mitigating factors, that is to say the affirmative presence of one or more of these factors during questioning would tend to mitigate the existence of custody at the time of the questioning. Conversely, the remaining three factors may be characterized as coercive factors, which is to say that the affirmative presence of one or more of these factors during questioning would tend to aggravate the existence of custody. It is not necessary to a finding of custody that all of the foregoing indicia be presented by the factual circumstances of a case, *United States v. Longbehn*, 850 F.2d 450, 452–53 (8th Cir. 1988), and a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors. *South Dakota v. Long*, 465 F.2d 65, 70 (8th Cir.1972). Realizing that the available means of coercion are as vast as the circumstances in which it may arise, we emphasize that the foregoing list is merely intended to be representative of those indicia of custody most frequently cited by this and other courts when undergoing the prescribed totality of the circumstances analysis. *Lanier*, 838 F.2d at 285; *Helmel*, 769 F.2d at 1320.

### I. Application of Indicia Factors

We turn now to examine how this framework has been applied to cases in this and other circuits. As previously noted, this Court is concerned with the suspect's subjective belief that "his freedom of action is curtailed to a degree associated with formal arrest" and whether that belief is objectively reasonable under the circumstances. *Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3150, *quoting, Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520.

#### (1) Advice Given by Officers

The most obvious and effective means of demonstrating that a suspect has not been "taken into custody or otherwise deprived of ... freedom of action," *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will. Where a suspect has been so advised, custody has frequently been found to not exist. *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985) (informing a suspect that he is not

under arrest is one factor frequently considered to show lack of custody), *citing, Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *Helmel,* 769 F.2d at 1306 (significant to finding of lack of custody that [the suspect] was specifically informed that he was not under arrest).[4] An important factor noted by this Court in finding an absence of custody in *United States v. Jones,* a case factually similar to this one, was that "Jones was informed that she was not under arrest and that she need not answer any questions." *Jones,* 630 F.2d at 616. By the same token, the absence of police advisement that the suspect is not under formal arrest, or that the suspect is at liberty to decline to answer questions, has been identified as an important indicium of the existence of a custodial setting. *See Minnick v. Mississippi,* — U.S. —, —, 111 S.Ct. 486, 492, 112 L.Ed.2d 489 (1990) (*Miranda* implicated by "formal interview which petitioner was compelled to attend"); *Carter,* 884 F.2d at 368 (custody where suspect was not told he was free to leave or that he did not have to answer questions).[5]

### (2) Restraint

■ We have often looked upon the lack of restraint on a suspect's freedom of movement during questioning, the second indicium of custody, as a factor indicating absence of custody. Circumstances of custody are frequently obviated where the suspect's freedom of action is not curtailed during questioning. In *Jorgensen* this Court found significant the fact that during questioning the interviewing officers allowed Jorgensen to go by himself to an unlocked, unguarded section of the F.B.I. offices to speak to his brother. We stated that "[t]his kind of latitude is clearly inconsistent with custodial interrogation." *Jorgensen,* 871 F.2d at 729; *Beckwith,* 425 U.S. at 343, 96 S.Ct. at 1614 (no custody where suspect permitted to move about his home unaccompanied).[6] This second factor is related to the first factor in that both concern the suspect's liberty during questioning and the suspect's subjective assessment of the circumstances. Though it is often the case that suspects are escorted or chaperoned during questioning for reasons unrelated to custody, as in this case where Agent Waldie testified that he was concerned for the safety of himself and his partner, "the relevant inquiry is the *effect on the suspect,*" *Carter,* 884 F.2d at 373, *citing, Berkemer,* 468 U.S. at 422, 104 S.Ct. at 3141. The "bare fact of physical restraint does not itself invoke *Miranda,*" (*Wilson v. Coon,* 808 F.2d 688, 689 (8th Cir.1987)), only that restraint which is of a "degree associated with formal arrest." *Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520. We realize that the likely effect on a

---

**4.** *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714 (finding of custody mitigated where suspect informed he was not under arrest and was free to leave); (*United States v. Goudreau,* 854 F.2d 1097, 1097 (8th Cir.1988)) (finding of custody mitigated where agents explained that the interview was voluntary and suspect was not placed under arrest); *United States v. Hocking,* 860 F.2d 769, 773 (7th Cir.1988) (finding of custody mitigated where suspect aware he is not compelled to answer questions); *Leviston,* 843 F.2d at 304 (no custody where suspect aware he was free to leave upon his own request); *but see South Dakota v. Long,* 465 F.2d 65, 68 (8th Cir.1972) (finding of custody despite clear warning that suspect was free to not answer questions where other circumstances strongly indicated custody).

**5.** *United States v. Longbehn,* 850 F.2d 450, 453 (8th Cir.1988) (custody where record reflected no evidence that suspect was free to leave); *United States v. Mahar,* 801 F.2d 1477, 1500 (6th Cir.1986) (custody where suspect was not told of right to consult an attorney, that he need not submit to the interview, nor that he was free to leave); *Beraun–Panez,* 812 F.2d at 581 (custody where suspect not told he was not under arrest or that he was free to leave).

**6.** *United States v. Dockery,* 736 F.2d 1232, 1234 (8th Cir.1984) (no custody where suspect not physically restrained during interview); *United States v. Rorex,* 737 F.2d 753, 757 (8th Cir.1984) (no custody where no attempt to restrict suspect's freedom of action); *Jones,* 630 F.2d at 616 (no custody where suspect had not been subjected to police escort and was in her own home under no physical restraint); *Helmel,* 769 F.2d at 1320 (no custody where suspect had free movement within the house); *Hocking,* 860 F.2d at 773 (no custody where no restraints were placed on the suspect's movements during the course of questioning); *compare Davis,* 778 F.2d at 170–71 (even though chaperoned to restroom during questioning, no custody where suspect permitted to leave stationhouse to eat dinner at home between interview sessions).

suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest. *Carter*, 884 F.2d at 372 (custody where suspect told "just stay here"); *Long*, 465 F.2d at 68 (custody where suspect continually chaperoned).[7]

### (3) Who Initiated Contact

The third indicium of custody concerns whether the interview was instigated by authorities or whether the suspect initiated contact or voluntarily acquiesced to official questions. As noted in *Miranda*, "custodial interrogation [means] questioning *initiated* by law enforcement officers." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added). Applying this fundamental precept of *Miranda* to cases in this circuit, this Court has frequently found custody lacking where suspects take the initiative to offer statements or voluntarily arrange for questioning. *Dockery*, 736 F.2d at 1234 (no custody where suspect initiated the interview); *Beckwith*, 425 U.S. at 342, 96 S.Ct. at 1612 (no custody where suspect invited agents into house).[8] Conversely, when the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist. *Longbehn*, 850 F.2d at 451 (custodial interrogation initiated when police confronted suspect at firing range); *Carter*, 884 F.2d at 369 (custodial interrogation initiated when police confronted suspect at work); *see also, Minnick*, —— U.S. at ——, 111 S.Ct. at 490 (prior invocation of fifth amendment privilege mitigated where "the accused himself initiates further communication, exchanges, or conversations with the police").[9]

### (4) Tactics Used

Police deployment of strong arm tactics or deceptive stratagems during interrogation, number four in the list of indicia of custody enumerated above, is a practice widely condemned in American law. The litany of pressure-tactics available to law enforcement, and their proven effectiveness in extracting confessions, are vividly described in the *Miranda* opinion and were the impetus for the *Miranda* decision itself. *Miranda*, 384 U.S. at 466, 86 S.Ct. at 1624. Because such strong arm tactics are more generally associated with formal arrest than with an informal encounter with police, the use of such tactics is identified as an indicium of custody. *Beraun–Panez*, 812 F.2d at 580 (custodial interrogation where officers confronted suspect with false or misleading witness statements, employed "Mutt and Jeff" routine, and took advantage of suspect's insecurities about his alien status). It goes without saying that a strong presumption of impropriety attaches to any circumstances where this Court detects the use of coercive interrogation techniques to obtain confessions. *Carter*, 884 F.2d at 371 (no good faith exception to "inadvertent" use of coercive interrogation tactics because inquiry concerns the effect of the interrogation techniques on the suspect). An interrogation can still be custodial even though no strong-arm tactics are used, *Longbehn*, 850 F.2d at 451–53, but the absence of such tactics is a factor which can assist us in reaching an objective conclusion that the suspect could not have associated the questioning with formal arrest. *Jones*, 630 F.2d at 616; *Dockery*, 736 F.2d at 1234.

### (5) Domination of Interview

An interrogation which occurs in an atmosphere dominated by the police, the

**7.** *Longbehn*, 850 F.2d at 453 (custody where suspect chaperoned and not told he was free to leave); *Mahar*, 801 F.2d at 1500 (custody where suspect not permitted to move about during search and questioning).

**8.** *Davis*, 778 F.2d at 170 (no custody where suspect voluntarily came to stationhouse for questioning two days after officers left message at his home requesting a visit); *Leviston*, 843 F.2d at 304 (no custody where suspect initiated inquiry by voluntarily speaking with investigators).

**9.** *See also Mahar*, 801 F.2d at 1499 (custodial interrogation initiated when police executed search warrant on suspect's place of business); *Beraun–Panez*, 812 F.2d at 581 (custodial interrogation initiated when police drove to remote part of suspect's ranch where suspect was herding cattle to conduct questioning).

fifth indicium of custody, is more likely to be viewed as custodial than one which does not. *Berkemer*, 468 U.S. at 438, 104 S.Ct. at 3149. The *Miranda* court was deeply concerned with the effect of an incommunicado, police dominated atmosphere on a criminal suspect's will to resist self-incrimination during interrogation. *Miranda*, 384 U.S. at 451, 86 S.Ct. at 1615 (1966). The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated.[10]

Other circumstances which indicate police domination of the custodial surroundings concern whether the police assume control of the interrogation site and "dictate the course of conduct followed by the [suspect]" or other persons present at the scene. *Jones*, 630 F.2d at 616.[11] Where the conduct of the police leads a suspect to believe that the police have taken full control of the scene, then we are more likely to recognize the existence of custody. A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements, an established interrogation practice noted by the *Miranda* court. *Miranda*, 384 U.S. at 451, 86 S.Ct. at 1615. Officers diminish the public character of, and assert their dominion over, an interrogation site by removing a suspect from the presence of third persons who could lend moral support. *Car-*

*ter*, 884 F.2d at 372 (police domination demonstrated when suspect isolated from co-workers who may have provided moral support); *Beraun–Panez*, 812 F.2d at 582 (agents interrogating rancher in pasture demonstrated domination of interrogation by stopping co-worker from approaching suspect); *Jorgensen*, 871 F.2d at 729 (atmosphere not police dominated when suspect permitted to speak with brother in private during questioning). When police resort to domineering practices, we find there exists a greater probability that an objective, reasonable person would feel in custody during the interrogation.

## III

### ANALYSIS OF EIGHTH CIRCUIT CASES

Four cases best reveal our application of the foregoing analysis to police interviews such as the one conducted in this case: *United States v. Helmel*, 769 F.2d 1306 (8th Cir.1985); *United States v. Jones*, 630 F.2d 613 (8th Cir.1980); *United States v. Carter*, 884 F.2d 368 (8th Cir.1989); and *South Dakota v. Long*, 465 F.2d 65 (8th Cir.1972). All four cases concern the custodial nature of police questioning occurring in surroundings familiar to the suspect: *Helmel, Jones,* and *Long* all specifically address interviews conducted at the suspect's place of residence while *Carter* concerns a workplace interview. We first address the "mitigating factors" in each case and then turn to the "coercive factors."[12]

---

**10.** *Compare Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (police dominated interrogation in suspect's home custodial), *with Jones*, 630 F.2d at 616 (interrogation in suspect's home found non-custodial because not police dominated); *compare Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3149 (questioning along open road during routine traffic stop non-custodial because not police dominated), *with Beraun–Panez*, 812 F.2d at 578 (questioning in open field custodial because atmosphere police dominated).

**11.** *Longbehn*, 850 F.2d at 453 (custody where police dictated suspect's course of conduct); *Mahar*, 801 F.2d at 1500 (custody where police took control of the scene); *Long*, 465 F.2d at 70 (custody where suspect's actions controlled by

police); *cf. Jones*, 630 F.2d at 616 (no custody where suspect not subject to any sort of police commands or dictations).

**12.** As discussed *supra* we have characterized the first three factors in the list of indicia of custody as "mitigating" the existence of custody and the final three factors in the list as indicia of a "coercive" custodial environment. For reference purposes the list may bear repeating here: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with au-

In finding an absence of custody in *Helmel*, the Court specifically addressed the first two factors and indicia of custody when it stated that "we consider it significant that [the suspect] was specifically informed by the agents that he was not under arrest ... and had free movement within the house." *Helmel*, 769 F.2d at 1320. We also specifically noted that interrogation was not initiated by law enforcement but that the suspect "responded to the request of his own free will." *Helmel*, 769 F.2d at 1320. After affirmatively finding the presence of all three mitigating factors, we further found the absence of any coercive factors. No strong arm tactics were used during the forty-five minute questioning and the fact that one agent answered all incoming calls during the questioning did not create a police dominated, coercive environment. *Helmel*, 769 F.2d at 1320. The sixth factor has no application here in light of the fact that the suspect was specifically informed that no arrest was contemplated at that time.

In reaching the same conclusion in *Jones* as we did in *Helmel* we addressed the first two mitigating factors and found it significant that Jones had been "informed that she was not under arrest and that she need not answer any questions ... [and] had not been subject to police escort." *Jones*, 630 F.2d at 616. With respect to the third factor, Jones invited officers into her house and voluntarily submitted to questioning after being informed that she was free to refuse. *Jones*, 630 F.2d at 615. We found no evidence in the record of the use of coercive factors or strong arm tactics, and specifically found that there had been no

"commands by interrogating agents intended to dictate the course of conduct followed by the defendant" or any other evidence of a police controlled environment. *Jones*, 630 F.2d at 616. As in *Helmel* the sixth factor has no application here.[13]

Applying the same analysis in *Carter* we came to the opposite conclusion as in *Jones* and *Helmel*. In *Carter* there were no mitigating factors present. Carter "was not told he was free to leave or that he did not have to answer questions." *Carter*, 884 F.2d at 368. He was not permitted unrestrained freedom of action during the interview, but instead was told to remain seated and to "just stay here." *Carter*, 884 F.2d at 368. The authorities, rather than Carter, initiated the questioning by summoning Carter to the office of the president of the bank where he worked. We also found evidence of coercive factors. Strong arm tactics such as the "Mutt and Jeff" routine were used. The interview occurred out of public view, away from co-workers who may have provided moral support, in police dominated, unfamiliar surroundings. Additionally, Carter was confronted with damning evidence of guilt. *Carter*, 884 F.2d at 370. The deficiency of mitigating factors in *Carter*, combined with the accumulation of coercive factors, demonstrated an intimidating atmosphere of custody which required an adequate warning of the suspect's constitutional rights under *Miranda* prior to questioning. *Carter*, 884 F.2d at 370.

In *South Dakota v. Long* we found that the totality of the circumstances indicated custody where the restrictions on the sus-

---

thorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong-armed tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated, *e.g.*, was questioning public or incommunicado, was suspect separated from those who would lend moral support, did authorities dictate the course of conduct of the suspect or other persons present, et cetera; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

**13.** In *Davis* the Fourth Circuit found custody wanting where only two mitigating factors were

affirmatively met, *e.g.* the suspect had been informed of his *Miranda* rights twice during questioning and had initiated the interrogation by voluntarily appearing at the police station. The third mitigating factor was partially met. Although the suspect had been escorted to the bathroom during questioning, the suspect was nonetheless allowed to go home for dinner unaccompanied during a break in the questioning and return on his own to the station after dinner. The *Davis* court also did not find any evidence that strong arm tactics were used or that the actions of the police created a coercive, police dominated atmosphere.

pect's freedom of action, and evidence of police domination, were so strong as to outweigh the mitigating effect of *Miranda*–like warnings given to the suspect. Questioning was first initiated by police when Long was pulled over while driving his car. The officers searched the car and then instructed Long to follow the patrol car to the sheriff's office for questioning in connection with a burglary investigation. Long was first questioned at the sheriff's office, permitted to leave to keep an appointment, accompanied by an officer, and questioning was resumed afterward at Long's dorm room. From the time of the initial confrontation at the police station to the final questioning in Long's dormitory room, Long was under continual police escort. *Long*, 465 F.2d at 65. The sheriff's requirement that Long continually remain in the presence of law enforcement authorities that afternoon was a restriction of Long's freedom of a "degree associated with formal arrest." *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520. Though the interrogation occurred largely in Long's own residence, we found this had the effect of isolating Long from public view and from friends who may have provided moral support, and created an environment of police domination. *Beraun–Panez*, 812 F.2d at 582.[14]

▮ The facts of this case stand in contrast to those in *Helmel* and *Jones*, where we declined to find custody, and more closely resemble those presented in *Carter* and *Long*. In this case, we find none of the mitigating factors cited in the list of indicia of custody, as in *Helmel* and *Jones*, but most of the coercive factors present in *Carter* and *Long*. Griffin did not initiate or arrange for the questioning as was done by the suspects in *Helmel* and *Jones*. Griffin himself did not invite the law enforce-ment into the house. He was not told he had the option to reject their request for an interview. Instead, the agents were admitted by Griffin's stepfather and Griffin was confronted in the hallway of his own home where questioning was initiated by the F.B.I. agents. Unlike the suspects in *Helmel* and *Jones*, Griffin was not informed that he was not under arrest, that he was at liberty to request the agents to leave, or that he could refuse to answer questions.

Griffin's freedom of action was restrained to a degree commonly associated with formal arrest during questioning when he was accompanied by an officer when he retrieved cigarettes from other rooms in the house and was told to remain in view of the agents at all times. Though Agent Waldie testified that the purpose of escorting Griffin was for safety concerns, this fact was not disclosed to Griffin at the time. We must consider the "effect on the suspect" of the agents' actions and we find that appellant could not reasonably have understood that he was free to do as he pleased when he was not permitted to go to another room of his own home without being accompanied by an an officer. *Carter*, 884 F.2d at 368.

The record does not reflect that strong arm tactics were employed in the questioning of Griffin; however, we note that we do not expect to find these tactics employed in every case, particularly when authority dictates that they should not be employed in any case. Strong arm tactics and deceptive stratagems are one indicium of custody, and are not a pre-requisite to a finding of custody. *Longbehn*, 850 F.2d at 452–53. Questioning which occurs in the suspect's own home may provide a margin of comfort, but, as previously noted, the setting of the interrogation is not so important to the inquiry as the question of police domi-

---

14. In *United States v. Longbehn* we found a police officer suspected of corruption to have been in custody when he was picked up at the police firing range, required to surrender his weapon, and transported under police supervision to police headquarters and then to his home to be present while it was searched. Longbehn was forced to leave his car at the firing range. Longbehn was continually in the presence of aggressive police officers while his home was being searched and was never instructed that he was not under arrest or was free to leave without responding to police questioning. These circumstances present none of the mitigating factors and some of the coercive factors cited in the list of indicia of custody. Accordingly, we concluded "that Longbehn's detention was police-dominated, inherently coercive, and tantamount to a formal arrest." *Longbehn*, 850 F.2d at 453.

nation of that setting. *Beraun–Panez*, 812 F.2d at 582. Here we find ample evidence of a police dominated, custodial environment in the fact that as soon as Griffin arrived at home the agents took control of the scene. Griffin was met by the agents in the hallway as he came in the door and was removed to the dining room of the house for "privacy." By sending Griffin's parents away, the agents asserted their dominion over the interrogation site, isolated Griffin from family who may have provided moral support, and eliminated any last vestige of a public interrogation. *Beraun–Panez*, 812 F.2d at 582; *Carter*, 884 F.2d at 368. Any objective reasonable person would conclude from these actions that the authorities were now in complete control of the defendant. Indeed the agents did create an atmosphere which caused Griffin to be "fearful." [15]

Finally, we believe Griffin's arrest at the conclusion of the interview is objective evidence which tends to support the reasonableness of Griffin's subjective belief that he was in custody from the inception of the encounter and that his arrest was imminent. Griffin had already implicated himself prior to questioning with his volunteered (and hence admissible) statement that "[t]he gun wasn't loaded." The level of police domination of his home, the restrictions on his actions during questioning, together with the fact that the agents never informed Griffin that he would not be arrested, reflects a pattern of conduct on the part of the officers that any reasonable person would associate with formal arrest.

Under these circumstances we are unable to agree with the district court's conclusion that Griffin could not have reasonably believed that the interrogation was custodial. We find that the interrogation of Griffin occurred in a custodial environment where he was improperly deprived of his right to receive *Miranda* warnings pri-or to making any kind of statement to the police.

We have undertaken an extended analysis for the reason that this case presents to us for the third time in as many years a situation where we must overrule a district court's ruling on the question of custody. *See United States v. Longbehn*, 850 F.2d 450 (1988); *United States v. Carter*, 884 F.2d 368 (1989).

"[T]he *Miranda* decision was prompted in large measure by judicial dissatisfaction with the difficulties and uncertainties inherent in case-by-case voluntariness determinations." *Carter*, 884 F.2d at 374. We note that in *Minnick v. Mississippi* the Supreme Court recently re-emphasized the advantages of the "clear and unequivocal guidelines" provided by the "bright line" rule of *Miranda*. *Minnick*, —— U.S. at ——, 111 S.Ct. at 489–90, *quoting*, *Arizona v. Roberson*, 486 U.S. 675, 682, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704 (1988). "A major purpose of the Court's opinion in *Miranda* ... was to give concrete constitutional guidelines for law enforcement agencies to follow. As we have stressed on numerous occasions, one of the principal advantages ... is the clarity of that rule" and the ease of its application. *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704 (1988), *citing*, *Berkemer*, 468 U.S. at 430, 104 S.Ct. at 3145. The motivation and purpose of the *Miranda* opinion, as well as the ease of its application, are undermined if its effect is to simply substitute the endless chain of voluntariness questions that crowded court dockets prior to its announcement with a new class of case-by-case determinations on the issue of what is custody. While not intending to establish a bright line rule of custody, the analysis we use is intended to provide law enforcement and prosecutors with some insight into the appropriate indicia of custody which should be taken into

---

**15.** It is the accepted logic that an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody. *Miranda*, 384 U.S. at 450, 86 S.Ct. at 1615. Nonetheless, it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence. After all, a person can not reasonably expect to be free anywhere if not within the refuge of his home.

consideration when analyzing the "totality of circumstances."

## IV

## CONCLUSION

■■■■ In reaching the conclusion we reach today we reiterate the central message of our previous holdings in *Carter* and *Long:* namely, that criminal suspects must have knowledge of their Fifth Amendment rights to be free from compulsory self-incrimination and to the assistance of counsel before they can either intelligently exercise or waive these important privileges. Law enforcement officers at all levels are obligated to provide a criminal suspect with knowledge of the suspect's constitutional rights any time a suspect is taken into custody, or the suspect's freedom is restricted in any significant manner and interrogation follows. *Carter,* 884 F.2d at 368; *Long,* 465 F.2d at 65; *interpreting Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625. The application of the rule of *Miranda* is not a process to be avoided by law enforcement officers. Custody should not be a mystical concept to any law enforcement agency. We see no reason why doubts as to the presence or absence of custody should not be resolved in favor of providing criminal suspects with the simple expedient of *Miranda* warnings. As noted in the *Miranda* opinion, and as demonstrated by case law and legal authority appearing in the intervening years since the announcement of the *Miranda* decision, the effectiveness of law enforcement is not undermined by informing suspects of their rights. *Miranda,* 384 U.S. at 483, 86 S.Ct. at 1632; *Davis,* 778 F.2d at 170–71; Y. Kamisar, W.R. Lafave & J.H. Israel, *Criminal Procedure,* 631–35 (1980). "Over the years the Federal Bureau of Investigation has compiled an exemplary record of effective law enforcement while advising any suspect or arrested person at the outset of an interview, that he is not required to make a statement, that any statement may be used against him in court, [and] that the individual may obtain the services of an attorney." *Miranda,* 384 U.S. at 483, 86 S.Ct. at 1632; *Davis,* 778 F.2d at 170–71.

As a general rule, and in any situation resembling the facts of this case in particular, we believe police officers should administer *Miranda* warnings as a matter of course. We cannot help but wonder why in a situation such as this, where the suspect had already made spontaneous, inculpatory remarks, the officers hesitated to advise him of his *Miranda* rights.

In this case the court notes that Griffin was arrested immediately after the interview. The rule is that "a policeman's unarticulated plan has no bearing on the question of whether a suspect is in custody at a particular time; the one relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3151.

In this case, the other factors we have discussed sufficiently support a finding of "in custody." We therefore need not address further the timeliness of the arrest.[16]

The constant reluctance of law enforcement to advise suspects of their rights is counterproductive to the fair administration of justice in a free society. Effective law enforcement is not frustrated when police inform suspects of their rights. Such practices protect the integrity of the criminal justice system by assuring that convictions obtained by means of confessions do not violate fundamental constitutional principles. *Minnick,* —— U.S. at ——, 111 S.Ct. at 491–92. The contrary proposition, however, is true: ignoring the requirements of *Miranda* is ineffective law enforcement which produces convictions that are ultimately reversed because agents of the law have not followed the dictates of the law themselves.

■■■ Our ruling suppressing statements elicited from Griffin during questioning

---

**16.** This court has held that in the examination of the totality of the circumstances, the absence of a post-interview arrest is one of the factors relevant to an "in custody determination." *United States v. Rorex,* 737 F.2d 753 (8th Cir. 1984). In an appropriate case, a post-interview arrest may suggest an "end run" around *Miranda.* This does not appear to be such a case.

does not affect Griffin's remark to the F.B.I. agents that "[t]he gun was not loaded." *Miranda* has no application to statements such as this that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response. *United States v. McGauley,* 786 F.2d 888, 891 (8th Cir.1986); *United States v. Webster,* 769 F.2d 487, 492 (8th Cir.1985). Accordingly we affirm the trial court's denial of Griffin's motion to suppress as to that statement.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for trial on the merits.