# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1432

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Shanon R. Thomas, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 26, 2011
Filed: December 22, 2011

_____

Before RILEY, Chief Judge, WOLLMAN and BEAM, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Shanon Thomas was convicted of first-degree murder in violation of 18 U.S.C. §§ 1111, 113, and 1153, and sentenced to life imprisonment. He appeals from his conviction, arguing that the district court[1] erred in denying his motion to suppress, his motion for judgment of acquittal, and his motion for a mistrial. We affirm.

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

## I.

On the evening of April 17, 2010, Thomas and his girlfriend, Marissa Mackey, found that Mackey's residence had been vandalized. They suspected that Dawn Starlin, Mackey's neighbor across the back alley and Thomas's former girlfriend, was the culprit. After discovering the vandalism, Thomas retrieved a gun from his sister's residence and left it behind Mackey's home. Thomas and Mackey then went out to a bar with some friends. When they returned home Thomas went outside, and Starlin, who was sitting in a chair in her backyard, began taunting him about his relationship with Mackey. Thomas retrieved the gun he had left earlier that evening, walked towards Starlin, and shot her multiple times. Starlin was found dead outside her home early in the morning on April 18, 2010.

Around four o'clock that afternoon, Thomas requested that the officers investigating Starlin's death come to his mother's home to speak with him. Upon arrival, the officers saw Thomas hugging his mother, who was crying. Thomas waved the officers inside. When the officers entered the house Thomas acted as though he expected to leave with them, saying "let's go," and stepping towards them. Officer Grunder then asked Thomas why he did "it" and whether he had been drinking. Thomas responded only that he had not been drinking. Grunder next asked Thomas where he had gotten the gun, Thomas replied that he had obtained it earlier the night of April 17th. Grunder asked where the gun was, to which Thomas replied that it was gone and that he "didn't mean to gun her down." Grunder testified that he thought he had enough probable cause to arrest Thomas after the last statement. Thomas was not advised of his Miranda rights before this conversation, which lasted only a minute or two. Thomas was placed under arrest and taken from his mother's home to the police station, where, after being advised of his Miranda rights, he made a full confession. The following day, at the Dakota County Jail, Thomas was again informed of his Miranda rights and interviewed, and he confessed again.

Before trial, Thomas moved to suppress evidence of the conversation that occurred at his mother's house, as well as his subsequent statements at the police station and jail. The district court denied the motion, finding that the statements made at the house were made in a non-custodial setting and that Thomas was informed of and waived his Miranda rights before making in-custody confessions.

The trial focused on Thomas's mental state at the time of the shooting. The jury was presented with the evidence of Thomas's confessions through the testimony of the FBI agents who had investigated the case. Additionally, Justina Tuttle and Waylon Wabasha testified that they had been socializing with Thomas and Mackey on the evening of April 17th. Tuttle and Wabasha both testified that Thomas had left Mackey's house and returned a few minutes later with a gun. Later in the evening, after the four of them returned from a bar and went inside Mackey's house, Thomas went outside for a few minutes. Upon returning, Thomas said that he had shot Starlin. Thomas's mother testified that when Thomas came to her house on the afternoon of April 18, 2010, he confessed to her that he had shot Starlin. Thomas's sister, Dezarae Thomas, and her boyfriend, Roger Saul, testified that Thomas had retrieved the gun from Dezarae Thomas's house around nine or ten o'clock the evening of April 17th. There was conflicting testimony about Thomas's actions after the shooting and statements he allegedly made earlier in the evening. Dezarae Thomas also testified that when she spoke to her brother on the phone the day after his arrest he said that he was not sorry he had killed Starlin. Following the close of the government's case the district court denied Thomas's motion for judgment of acquittal.

Thomas objected twice during trial on grounds of prosecutorial misconduct, first when the prosecution asked a witness if she had been threatened for testifying at the trial. The district court sustained the objection, gave the jury a curative instruction, and denied Thomas's motion for mistrial. Additionally, the district court

overruled Thomas's objection to the prosecution's statement during closing argument that "if this isn't a first degree murder case, ladies and gentlemen, I don't know what is."

## II.

We turn first to Thomas's claim that his statements at his mother's home and his subsequent confessions should have been suppressed because they were obtained in violation of his Fifth Amendment rights.

"We review *de novo* the legal conclusions underlying the denial of a motion to suppress on Fifth Amendment grounds, while the factual findings are reviewed for clear error." United States v. Wise, 588 F.3d 531, 536 (8th Cir. 2009) (quoting United States v. Binion, 570 F.3d 1034, 1041 (8th Cir. 2009)).

Miranda warnings "protect the individual against the coercive nature of custodial interrogation" and are required only when a person is in custody. J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011). "Whether a suspect is 'in custody' is an objective inquiry." Id. This inquiry turns on (1) the circumstances surrounding the interrogation and (2) whether a reasonable person would have felt at liberty to end the interrogation and leave under those circumstances. Id. (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)). In evaluating whether an individual was in custody, we turn to the Griffin factors, while remembering that "the list is decidedly non-exhaustive." United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990). The factors are (1) whether the suspect was informed that the questioning was voluntary and he was free to leave; (2) whether the suspect's freedom of movement was restrained; (3) whether the suspect initiated contact with the authorities; (4) whether coercive tactics were used during questioning; (5) whether the atmosphere of the questioning was police dominated; and (6) whether the suspect was placed under arrest at the end of questioning. Id. "[A] particularly strong showing with respect to one factor may

compensate for a deficiency with respect to other factors." Id. (citing South Dakota v. Long, 465 F.2d 65, 70 (8th Cir. 1972)). We are mindful that "[t]he ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." United States v. Czichray, 378 F.3d 822, 828 (8th Cir. 2004).

We conclude that Thomas's statements made in his mother's home were made in a non-custodial setting. Thomas requested that law enforcement come speak to him and invited them inside when they arrived. Although Thomas was not informed that the questioning was voluntary, he was free to move about within his mother's home, and the officers used no coercive tactics. The police did not deceive Thomas through their questioning, they did not touch him or move toward him in an intimidating manner, and their questioning took place in the presence of Thomas's mother. See Griffin, 922 F.2d at 1352 (noting that "[a] frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues").

That Thomas was arrested at the conclusion of Grunder's short series of questions is a factor that bears consideration. In light of all of the surrounding circumstances, however, especially Thomas's request that law enforcement come speak to him, we conclude that he was not in custody. Grunder testified that he did not believe he had probable cause to arrest Thomas prior to Thomas's statement that "he didn't mean to gun her down." The district court credited this testimony, and we recognize that the district court has a "distinct advantage" in evaluating credibility, and that its determinations are "virtually unreviewable on appeal." United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011) (quoting United States v. Ralph, 480 F.3d 888, 890 (8th Cir. 2007)). The entire encounter at the house lasted less than five minutes, and once Thomas was placed under arrest he was not interrogated further until after he had been read his Miranda rights at the police station.

Thomas contends that his confessions made in custody must also be suppressed as "fruit of the poisonous tree" of his first interrogation. This argument necessarily fails because we have determined that there was no initial constitutional violation. Further, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Oregon v. Elstad, 470 U.S. 298, 318 (1985). So long as the confession at the police station is voluntary, as it was here, it will not be excluded based on an earlier unwarned statement.

Likewise, Grunder did not employ an impermissible two-part interrogation technique. In Missouri v. Seibert, 542 U.S. 600 (2004), the Court held that when officers purposefully elicited an unwarned confession from a suspect, and then provided Miranda warnings and elicited the confession again, the statements made after the warnings were inadmissible. Id. at 604. The statements are inadmissible, however, only when an officer has intentionally used a two-step interrogation process in an effort to circumvent Miranda requirements. United States v. Torres-Lona, 491 F.3d 750, 757-58 (8th Cir. 2007) (adopting as controlling Justice Kennedy's concurrence in Seibert). Here, the district court credited Grunder's testimony that he did not believe he had probable cause to arrest Thomas at the time law enforcement arrived at the house. It was only after Thomas stated that he "did not mean to gun her [Starlin] down" that Grunder placed him under arrest. Grunder asked questions to establish probable cause, not to circumvent Miranda warnings. The district court did not clearly err in crediting Grunder's testimony, and thus we conclude that Thomas's post-Miranda statements were properly admitted.

Finally, we note that any error in admitting the statements made in the house would have been harmless. "The admission of statements obtained in violation of Miranda may constitute harmless error where there remains overwhelming independent evidence as to the defendant's guilt." Chavez v. Weber, 497 F.3d 796, 805 (8th Cir. 2007) (quoting United States v. Packer, 730 F.2d 1151, 1157 (8th Cir.

1984)).  As discussed above, if the statements made prior to Thomas's arrest had not been admitted it would still have been proper under <u>Seibert</u> to admit his subsequent confessions.  Furthermore, Thomas confessed to his mother, his sister, Justina Tuttle, and Waylon Wabasha.  Thus, even without Thomas's statement that he "didn't mean to gun her down," the evidence of his guilt was overwhelming.

## III.

We consider next Thomas's contention that his motion for judgment of acquittal should have been granted for want of sufficient evidence.

We review *de novo* the denial of a motion for judgment of acquittal.  <u>United States v. Worman</u>, 622 F.3d 969, 977 (8th Cir. 2010).  "A conviction will be reversed only if, after viewing the evidence most favorably to the verdict and giving the government the benefit of all reasonable inferences, no construction of the evidence supports the jury's verdict."  <u>Id.</u>  Thomas argues that the evidence of his mental state does not support a conviction for first-degree murder, which requires premeditation.  18 U.S.C. § 1111(a).

The jury's verdict that Thomas's action was premeditated and thus constituted first-degree murder is amply supported by the evidence.  The district court properly instructed the jury that a killing is premeditated when it results from planning or deliberation, that the time needed for premeditation varies with the circumstances, and that the killer must be conscious of his intent to kill.  <u>United States v. Haskell</u>, 468 F.3d 1064, 1074 (8th Cir. 2006).  The jury heard evidence of Thomas and Starlin's romantic history, as well as the tension that developed when Thomas became involved with Mackey. Thomas retrieved a gun from his sister's home and left it behind Mackey's home on the evening of April 17, 2010.  Hours later, after being spoken to and taunted by Starlin, who was unarmed and seated, Thomas retrieved the gun.  He walked toward Starlin and fired multiple shots.  The jury could reasonably have

concluded that Thomas formed the requisite intent when he initially brought the gun to Mackey's house, when he picked the gun up and walked towards Starlin, or in the moment before he started firing. Because there are multiple constructions of the evidence that support the jury's verdict, the district court did not err in denying the motion for judgment of acquittal.

IV.

Thomas's final contention is that the district court erred in denying his motion for mistrial based on prosecutorial misconduct.

We review for abuse of discretion the denial of a motion for a mistrial based on prosecutorial misconduct. United States v. Swift, 623 F.3d 618, 623 (8th Cir. 2010). To reverse a conviction "based on prosecutorial misconduct to which there was a proper objection, a defendant must show that (1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct affected the defendant's substantial rights so as to deprive him of a fair trial." United States v. Montgomery, 635 F.3d 1074, 1096-97 (8th Cir. 2011) (quoting United States v. New, 491 F.3d 369, 377 (8th Cir. 2007)). In determining whether the defendant was deprived of a fair trial we consider "(1) the cumulative effect of the misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions, if any, taken by the district court." United States v. Eagle, 515 F.3d 794, 804-05 (8th Cir. 2008).

The district court did not abuse its discretion in denying Thomas's motion for a mistrial based on a single question the prosecution asked government witness Davida Henry on redirect examination. As recounted earlier, the district court sustained Thomas's objection to the question whether Henry had been threatened before she testified. After a discussion outside the presence of the jury, the court instructed the jury that "the Court made an inquiry, and you should be aware that there is no evidence that the defendant in this case made any threat against the witness,

-8-

Davida Henry, directly or indirectly." Trial Tr. 341. An improper question does not necessitate a mistrial when the objection is promptly sustained and curative instructions are given. See United States v. Lockett, 601 F.3d 837, 841 (8th Cir. 2010) (affirming the denial of motion for mistrial when the government asked a witness if he feared for his safety in testifying, the district court sustained the defense's objection, struck the question from the record, and instructed the jury to disregard the question).

Thomas also contends that the prosecutor's final remark during closing argument was improper. The district court is "vested with broad discretion in controlling closing arguments and we will reverse only on a showing of abuse of discretion." United States v. Miller, 621 F.3d 723, 729 (8th Cir. 2010) (quoting United States v. Eldridge, 984 F.2d 943, 946 (8th Cir. 1993)). The government argues that the prosecutor's statement, "if this isn't a first degree murder case, ladies and gentlemen, I don't know what is," was an invited response to the defense's closing argument that "This is not a first-degree murder. This is not a second degree murder." The government acknowledges, however, that a rhetorical question would have been more appropriate. While the remark was improper, the district court did not abuse its discretion in overruling Thomas's objection in light of statements the defense had made in its closing. Furthermore, when viewed in light of the strong evidence of guilt, Thomas was not deprived of a fair trial. See Eagle, 515 F.3d at 806 (2008) (upholding the denial of a mistrial where the government made improper remarks in closing, because the evidence of defendant's guilt was strong and included a confession, thus the remarks likely did not affect the jury's decision). We conclude that the instances of misconduct, whether viewed singly or cumulatively, did not deprive Thomas of a fair trial.

The judgment of conviction is affirmed.

_____