# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-2199

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Nabil Y.M. Rashid, | * |
| | * |
| Appellant. | * |

_____

No. 03-2300

_____

Appeals from the United States
District Court for the
Western District of Missouri

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Soheir A. Abu Nahia, | * |
| | * |
| Appellant. | * |

_____

Submitted: November 18, 2003
Filed: September 10, 2004

_____

_____

Before LOKEN, Chief Judge, and McMILLIAN and BEAM, Circuit Judges.
_____

McMILLIAN, Circuit Judge.

Nabil Y.M. Rashid and Soheir A. Abu Nahia appeal from final judgments entered in the United States District Court[1] for the Western District of Missouri upon jury verdicts finding them guilty of conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 371, 1344, and attempted bank fraud, in violation of 18 U.S.C. §§ 1344, 2. Defendants were tried together; neither defendant testified at trial. The district court sentenced each defendant to 63 months imprisonment, 3 years supervised release, and a special assessment of $200.00. For reversal, Rashid argues that the district court erred in failing to give a limiting instruction and a good faith defense instruction. Nahia argues that her conviction for attempted bank fraud cannot stand because the government failed, as a matter of law, to prove that the cashier's check constituted a material false representation. For the reasons discussed below, we affirm the judgments of the district court.

The district court had original criminal jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. Neither defendant has raised any sentencing issues on appeal.

In January 2002 a federal grand jury charged defendants with conspiracy to commit bank fraud and attempted bank fraud. The government's evidence at trial showed that on January 7, 2002, Rashid and Nahia entered a Kansas City, Missouri, branch of the Bank of America. Robert Stinson, the branch bank manager,

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

-2-

approached them and asked if they needed assistance. Rashid told Stinson that they wanted to open a checking account. Stinson took them into his office. Rashid told Stinson that they wanted to open the account with $15 million and presented him with what was purported to be a $15 million Bank of America cashier's check. The cashier's check was made payable to "bearer only," drawn on the First National Bank of California, dated October 15, 2001, and had a routing number along the bottom and the signature of an unknown bank official. The cashier's check was also an unusual size and printed on a different weight paper than the usual cashier's check, and the Bank of America logo on the cashier's check was incorrect. Nahia told Stinson that she wanted to put $5 million in the account and receive $10 million back and that the $10 million for was her uncle. She said that the cashier's check was the result of a "big bank deal" in California involving her uncle.

Stinson advised defendants that he needed to verify the cashier's check through the bank. Nahia said that she was aware of that because she had completed transactions like this for even larger amounts in Europe and was familiar with the process. Rashid occasionally nodded in agreement with Nahia's statements. Stinson called the bank's fraud department and faxed them a copy of the cashier's check. The bank's fraud department determined that the routing number was incorrect, there was no such bank in California, and the cashier's check was not negotiable, and advised Stinson to call the police. Stinson called the police. The police arrived shortly thereafter and arrested defendants.

The evidence also showed that, two days earlier, on January 5, 2002, Rashid visited a different Bank of America branch bank in Kansas City, Missouri. He presented a bank employee, Delisa Biggs, with a photocopy of the $15 million cashier's check and asked her if the bank would cash it. Biggs told Rashid that he would have to come back with the original. Biggs made a copy of the photocopy and faxed it to the bank's fraud department. Steven Barfield, the head of corporate security for the Bank of America's Kansas City branch banks, testified that he sent

a fax to all the area branch banks alerting them about the attempt to negotiate the $15 million cashier's check.

The evidence also showed that, that same day (January 5, 2002), Nahia went to the First Bank of Missouri in North Kansas City, Missouri. The lobby entrance was closed. She walked up to the drive-through window and handed the drive-through teller, Ryan Hauk, a photocopy of the $15 million cashier's check and told him that she wanted to cash it. Hauk consulted another bank employee, Lisa Clark. Clark told Nahia that she would have to open an account before the bank would cash the check and that she would have to present the original. Nahia said that she had the original in her car. Because the bank was closed, Clark told Nahia to come back on Monday. Clark wrote the bank's phone number on the back of a receipt and gave it to Nahia.

Dixie Linkey testified that she was a personal banker at the Bank of Weston (she is now a branch supervisor) and in late 2000 she opened a personal checking account for Nahia. In December 2001 Nahia faxed Linkey a photocopy of what was purported to be a $470,000 Bank of America cashier's check. In the fax cover memo Nahia asked Linkey to determine whether "this check is true" and whether it was valid for "this amount of money." Linkey testified that she thought the cashier's check was probably not a good check (because its appearance was unusual) and that she showed the fax to a Bank of America employee who told her that the cashier's check was "not good." Linkey attempted to send an e-mail memo to Nahia about the cashier's check, but she did not know whether Nahia in fact ever received the e-mail memo.

An FBI forensic computer analyst testified that Rashid had researched cashier's checks on the Internet on his home computer on January 5, 2002. However, there was no evidence that the cashier's check had been produced on Rashid's computer. During a consent search of Nahia's residence, FBI agents found a photocopy of the

$15 million cashier's check between the pages of a baby book; Nahia's right thumb print was on the photocopy.

Nahia made two statements to FBI agents following her arrest. (As noted above, Nahia did not testify at trial.) FBI special agent Kevin McCrary testified that he interviewed Nahia on January 7, 2002. Nahia told him that she and "her companion" had attempted to negotiate the $15 million cashier's check and that her uncle, Mohammad Atar, a prominent businessman, had given her the cashier's check while she was visiting him in Jordan. She said that her uncle had received the cashier's check from someone in California and that he told her to take the cashier's check to California, cash it, pay $10 million to someone in California, and then return $5 million to him. She said that she believed the cashier's check was good based on her uncle's representations. On re-cross-examination by Rashid's defense attorney, McCrary testified that Nahia said that "her friend, Mr. Rashid," told her that it would be cheaper and easier to cash the cashier's check in Kansas City (rather than go to California) and that he offered to help her cash the cashier's check and then selected the particular branch bank.

FBI special agent Walter Schaefer testified that he interviewed Nahia on January 8, 2002. Nahia told him that her uncle gave her the cashier's check and asked her to get two cashier's checks, one for $10 million payable to his company in California, the Abira Association Co., and a second for $5 million payable to him. FBI special agent John Timmerberg testified that the California secretary of state's office searched its corporate files for several variations of that corporate name and found no record of it.

Each defendant filed a motion for judgment of acquittal, which the district court denied. Rashid proposed an instruction limiting the admission of Nahia's out-of-court statements as evidence against her only. The government proposed a similar limiting instruction (plaintiff's proposed instruction No. 8). The district court

refused to give the proposed limiting instruction, reasoning that Nahia's out-of-court statements were not confessions and instead were false exculpatory statements. The district court also refused to give Rashid's proposed good faith defense instruction. The jury found each defendant guilty on both counts. The district court sentenced each defendant to 63 months imprisonment, 3 years supervised release, and a special assessment of $200.00. These appeals followed.

LIMITING INSTRUCTION

Rashid first argues that the district court erred in refusing to give his proposed instruction limiting the admission of Nahia's out-of-court statements as evidence against her only. Rashid argues that his Sixth Amendment right to confrontation was violated by the admission of Nahia's out-of-court statements, citing Cruz v. New York, 481 U.S. 186, 189 (1987). Nahia did not testify at trial and thus was not available for cross-examination. Rashid argues that a limiting instruction was required because Nahia's statements incriminated him when linked to other evidence. Rashid argues that the error was compounded because the instruction on co-conspirator's statements (instruction No. 21) expressly instructed the jury to consider the statements made by a defendant's co-conspirators "during the existence of the conspiracy and in furtherance of it" but improperly failed to caution the jury to consider statements made after the conspiracy ended (and before it began) as admissible only against the declarant and not against any other defendant. Rashid argues that the government relied on Nahia's statements to establish fraudulent intent and to show that her explanations about the cashier's check were not credible.

As a preliminary matter, the government argues that Rashid did not object to the district court's refusal to give the proposed limiting instruction and therefore the plain error standard of review applies. On the merits, the government argues that the district court did not err in refusing to give the proposed limiting instruction because Nahia's statements did not even mention Rashid or implicate him in any

wrong-doing. The government also argues that Nahia's statements were not admitted as co-conspirator's statements and characterizes them as false exculpatory statements and not as confessions. The government also argues that any error was harmless because the properly admitted evidence against Rashid was overwhelming.

We review this issue for plain error because, although Rashid proposed a limiting instruction, he failed to preserve the error for appellate review when he failed to object when the district court refused to give that instruction. See United States v. Parisien, 574 F.2d 974, 976 (8ᵗʰ Cir.) (per curiam) (initial tender of alternative instruction without objecting to failure to give requested instruction does not comply with Fed. R. Crim. P. 30 and will be reviewed for plain error), cert. denied, 439 U.S. 850 (1978). We also think that plain error review is appropriate because the reason why Rashid argues the limiting instruction should have been given is a Bruton error, that is, Nahia's statement incriminated him when linked to other evidence and was admissible only if a limiting instruction was given to the jury (and the statement is redacted to omit any reference to him). See Bruton v. United States, 391 U.S. 123 (1968). However, Rashid did not object to the first reference to him (when McCrary testified on direct examination that Nahia stated that she and "her companion" had attempted to negotiate the $15 million cashier's check that her uncle had given her) and invited the subsequent references (when McCrary testified on re-cross-examination that Nahia stated that that "her friend, Mr. Rashid," told her that it would be cheaper and easier to cash the cashier's check in Kansas City (rather than go to California) and offered to help her cash the cashier's check and then selected the particular branch bank). But cf. United States v. Davis, 443 F.2d 560, 564-65 (5ᵗʰ Cir.) (defense counsel's cross-examination which elicited agent's hearsay testimony about defendant's supervision of drug addict was invited error which precluded invoking plain error rule), cert. denied, 404 U.S. 945 (1971). Plain error is error that is "plain" (that is, clear or obvious), "affects substantial rights" (that is, prejudicial) and "seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732-37 (1993).

Subsequent to the filing and oral argument of this appeal, the Supreme Court decided Crawford v. Washington, 124 S. Ct. 1354 (2004), which has changed Confrontation Clause analysis. In Crawford, the Supreme Court held that the Confrontation Clause bars the admission of out-of-court testimonial statements unless the declarants are unavailable and the defendant had a prior opportunity to cross-examine them. Id. at 1369. The Court did not define "testimonial," id. at 1374, but did cite "ex parte testimony at a preliminary hearing" and "[s]tatements taken by police officers in the course of interrogation," as examples of "this core class of 'testimonial' statement." Id. at 1364, 1374 (noting that the term "testimonial" statement includes at a minimum prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and police interrogations). Crawford did not overrule Bruton and in fact cited Bruton as an example of a case which was consistent with the original understanding of the Confrontation Clause, id. at 1367-70, as opposed to the now-discredited balancing test set forth in Ohio v. Roberts, 448 U.S. 56 (1980).

Here, Nahia's statements were statements taken by FBI agents in the course of interrogations and thus testimonial for purposes of Crawford. Nahia was a non-testifying co-defendant and thus was not available as a witness, but Rashid did not have a prior opportunity to cross-examine her. The admission of Nahia's statements therefore violated Rashid's Confrontation Clause rights. Rashid failed to preserve this error for appellate review. As discussed below, we find no plain error because Nahia's statements did not expressly or impliedly incriminate Rashid and the other evidence of Rashid's guilt was overwhelming. Cf. United States v. McClain, 377 F.3d 219, 222 (2d Cir. 2004) (applying harmless error analysis to Crawford Confrontation Clause violation).

Crawford may have eclipsed Bruton. Nonetheless, applying our pre-Crawford analysis to Rashid's claim of Bruton error, we find no Bruton violation here and therefore hold that the district court did not err in refusing to give the proposed limiting instruction.

In Bruton the Supreme Court held that in a trial where two or more defendants are tried jointly, the admission of a nontestifying codefendant's confession that expressly implicates the defendant violates the defendant's Sixth Amendment confrontation rights, even if the district court gave the jury limiting instructions to consider the confession only against the codefendant who confessed. However, "[i]f a codefendant's confession does not incriminate the defendant on its face, but does so only when linked to additional evidence, it may be admitted if a limiting instruction is given to the jury and the defendant's name is redacted from the confession." Furthermore, Bruton does not apply at all when a codefendant's statements do not incriminate the defendant either on their face or when considered with other evidence.

United States v. Melina, 101 F.3d 567, 569-70 (8th Cir. 1996) (citations omitted).

Nahia's first statement referred to "her companion" and then to "her friend, Mr. Rashid"; her second statement did not mention Rashid at all (either by name or by relationship). Nahia's first statement expressly mentions Rashid, but it does not on its face incriminate him. The statement does not refer to the charged crimes (conspiracy and attempted bank fraud) and does not refer to any wrong-doing. See, e.g., Melina, 101 F.3d at 570 (statements expressly mention defendant but are on their face not incriminating); United States v. Flaherty, 76 F.3d 967, 972 (8th Cir. 1996) (same) (abrogation on other grounds noted in United States v. Rea, 223 F.3d 741, 743 (8th Cir. 2000)); United States v. Escobar, 50 F.3d 1414, 1422 (8th Cir. 1995) (same); see also Marsh v. Richardson, 481 U.S. 200, 213 n.2 (1987) (Stevens, J., dissenting) (noting possibility that "there are some codefendant confessions that expressly mention the defendant but nonetheless need not be excluded under Bruton because they are not prejudicial"). Compare United States v. Richards, 241 F.3d 335, 341 (3d Cir.) (noting co-defendant's reference identifying "his friend" as one of the robbers was sharply incriminating), cert. denied, 533 U.S. 960 (2001). Bruton is not applicable because this statement by itself does not implicate Rashid in any wrong-doing.

Even assuming that this statement is incriminating when linked with other evidence and that the district court should have given a limiting instruction to the jury (and redacted Rashid's name from the statement), Rashid failed to show that the district court's failure to give a limiting instruction was prejudicial or resulted in a miscarriage of justice and thus constituted plain error. The evidence against Rashid was overwhelming. Evidence in the record independent of Nahia's statements showed that on January 7, 2002, Rashid went with Nahia to a Bank of America branch bank and that Rashid told a bank employee that they wanted to open a checking account, presented the $15 million cashier's check and attempted to cash it; on January 5, 2002, Rashid went to another Bank of America branch bank with a copy of the $15 million cashier's check and asked whether the bank would cash it; on January 5, 2002, Rashid researched cashier's checks on the Internet on his home computer; and many specific physical characteristics of the $15 million cashier's check that showed that it was fraudulent.

As an evidentiary matter, we note that Nahia's statements were not admitted as co-conspirator's statements under Fed. R. Evid. 801(d)(2)(E). Statements or admissions made by a co-conspirator after apprehension, to law enforcement officials, are not "in furtherance" of the conspiracy. E.g., United States v. Alonzo, 991 F.2d 1422, 1425 (8th Cir. 1993). Nahai's post-arrest, custodial statements made to FBI agents were not intended to further a successful conspiracy and thus were not admissible against Rashid as co-conspirator's statements. We also note that co-conspirator's statements are not testimonial for purposes of Crawford analysis. See United States v. Lee, 374 F.3d 637, 644 (8th Cir. 2004); cf. Evans v. Luebbers, 371 F.3d 438,445 (8th Cir. 2004) (hearsay statements admissible as statements made for purpose of obtaining medical diagnosis and as evidence of mental state are not testimonial for purposes of Crawford analysis (assuming for purposes of analysis that Crawford applies retroactively and on collateral attack)).

## GOOD FAITH DEFENSE INSTRUCTION

Rashid next argues that the district court erred in refusing to give his proposed good faith defense instruction. Because Rashid did not object to the district court's refusal to give the proposed instruction, we review for plain error. Rashid argues that good faith is a complete defense to crimes of intent and that the evidence showed that he had a good faith belief that the $15 million cashier's check was legitimate. He argues that there was no evidence that he ever lied about any person, place or thing or attempted to conceal any facts from any person or that any bank employee ever told him that the $15 million cashier's check was fraudulent. The government argues that there was no evidence that Rashid either made an honest mistake or had a good faith belief that the $15 million cashier's check was legitimate and that this is essentially an argument about the sufficiency of the evidence of fraudulent intent.

"It is true that a defendant is entitled to a jury instruction if the request is timely, the evidence supports the instructions, and the proffered instruction correctly states the law." United States v. Sanders, 834 F.2d 717, 719 (8th Cir. 1987) (citation omitted). However, "a defendant is not entitled to a particularly worded instruction where the instructions given adequately and correctly cover the substance of the requested instruction." United States v. Lisko, 747 F.2d 1234, 1238 (8th Cir. 1984). In Sanders the defendant argued that the district court erred in refusing to give his requested good faith instruction with respect to a criminal conversion charge and a charge of making a false statement to a government agency. We found no error in that case because the instructions given regarding the need to find specific intent to defraud in order to find the defendant guilty of criminal conversion were sufficient to cover the good faith defense. 834 F.2d at 719, citing Lisko, 747 F.2d at 1237-38 (citing United States v. Nance, 502 F.2d 615, 619-20 (8th Cir. 1974) (instructions defining knowing and willful fraudulent scheme made clear that good faith would be absolute defense), cert. denied, 420 U.S. 926 (1975)).

-11-

We find no error, much less plain error, in the district court's refusal to give the requested good faith instruction. "The essence of a good-faith defense is that one who acts with honest intentions cannot be convicted of a crime requiring fraudulent intent." United States v. Sherer, 653 F.2d 334, 338 (8th Cir.), cert. denied, 454 U.S. 1034 (1981). Here, the instructions given were sufficient to cover the essence of the good faith defense. The instructions given stated that in order to find the defendant or defendants guilty of attempted bank fraud the jury had to find, beyond a reasonable doubt, that each defendant individually, voluntarily and knowingly, intentionally attempted to execute a scheme to obtain monies or funds owned by a financial institution by means of material fraudulent or false representations with intent to defraud. Instruction Nos. 22, 24; see Sherer, 653 F.2d at 338 (holding adequate for purposes of good faith defense that jury was instructed that it must find intent to defraud beyond a reasonable doubt). Other instructions given stated that mere presence or mere association did not prove that a defendant had joined the charged conspiracy or become an aider or abettor. Instruction Nos. 17, 24.

MATERIALITY

Nahia argues that the evidence was insufficient to prove materiality for purposes of bank fraud. She argues that the government failed to prove as a matter of law that the $15 million cashier's check constituted a material false representation because the check was so obviously fraudulent that no bank official could have been influenced to take any action in reliance on it. The government argues that the evidence was sufficient to establish materiality and notes that, as the district court instructed the jury, materiality does not depend upon whether the financial institution was actually deceived.

We review a challenge to the sufficiency of the evidence by examining the record in the light most favorable to the government and resolve all conflicts in the government's favor. E.g., United States v. Wonderly, 70 F.3d 1020, 1023 (8th Cir.

1995), <u>cert. denied</u>, 517 U.S. 1146 (1996). "The materiality inquiry focuses on whether the false statement had a natural tendency to influence or was capable of influencing the [financial institution]. Materiality does not require proof that the [financial institution] actually relied on the statement." <u>United States v. Baker</u>, 200 F.3d 558, 561 (8th Cir. 2000) (citations omitted) (discussing materiality for purposes of making a false statement to the government in violation of 18 USC § 1001). Here, the nature of the item itself was evidence of materiality. The evidence showed that defendants presented bank employees with a fraudulent Bank of America cashier's check and made false statements about the check in order to influence the bank to negotiate it. The fact that the cashier's check was obviously fraudulent (apparently the check was the wrong size and printed on the wrong type of paper, the check was made out to bearer only, the bank logo was wrong, and the perforation was in the wrong place) does not mean that it was not material, that is, that it did not have a natural tendency to influence the bank or was not capable of influencing the bank. The fact that the bank was not actually influenced or actually deceived does not mean that the check and defendants' false statements about the check were not material.

Accordingly, the judgments of the district court are affirmed.

_____