# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-2206

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Cyril S. Plumman, also known as | * | |
| Steve Plumman, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: December 14, 2004
Filed: June 3, 2005

———————

Before MORRIS SHEPPARD ARNOLD, BEAM, and RILEY, Circuit Judges.

———————

RILEY, Circuit Judge.

The government indicted Cyril Steve Plumman (Plumman), a Native American residing within the territory of the Rosebud Indian Reservation, with seven counts of aggravated sexual abuse of two minor females and with ten additional counts of sexual abuse of two minor females, in violations of 18 U.S.C. §§ 1153, 2241(c), 2246(2)(A)-(D). A jury convicted Plumman on sixteen of the seventeen counts. The

district court[1] sentenced Plumman to mandatory life imprisonment. Plumman appeals his convictions and sentence. We affirm the convictions on all counts and the sentences on Counts VIII through XVII, but remand for resentencing on Counts I through VI, as explained below.

## I.    BACKGROUND
### A.    Factual Summary

Because this case involves two minor females, we refer to the minors by initials. K.P. was born October 8, 1989, and her younger sister, P.P., was born on October 20, 1990. K.P.'s and P.P.'s biological father died in August 1995. Thereafter, their mother Sandra Iron Shell (Sandra) and Plumman began a relationship. Plumman moved into Sandra's home in October 1996. K.P. and P.P. lived with Sandra, Plumman, and their two younger half-siblings, born of the union between Sandra and Plumman.

In early March 2003, P.P., who was twelve years old, handed Sandra a note, which stated Plumman was touching P.P., she did not like Plumman touching her, but nothing was going on. The note also stated P.P. wanted Plumman to stop touching her, and P.P. was sorry. On the note P.P. drew a sad face bearing a frown with tears streaming from the eyes. After receiving the note, Sandra confronted Plumman, who denied doing anything to P.P. Sandra also spoke to P.P. and K.P., and both denied having any sexual contact with Plumman. Sandra told P.P. if Plumman touched her again, she should tell her school counselor.

Sometime in late March or early April, Sandra unexpectedly returned home one morning from work. Once inside the house, Sandra noticed K.P.'s bedroom door was closed. When she opened the door to K.P.'s bedroom, Sandra saw Plumman standing

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

near the bed wearing only a pair of black trunks. K.P. was awake and lying under the bed covers. Sandra asked Plumman what he was doing in the bedroom, and Plumman replied he was trying to fix something. Although suspicious, Sandra took no protective actions.

On April 8, P.P. was attending the He Dog School and requested to see the school counselor, Sherwood Paul Vosburg (Vosburg). P.P. told Vosburg Plumman had touched her and her sister K.P. inappropriately. Vosburg asked P.P. if her mother knew about the improper touching, and P.P. explained that her mother had told her to tell the school counselor. Thereafter, Vosburg called Sandra, informed her of the allegations and confirmed Sandra knew of the allegations and had instructed P.P. to tell the school counselor. Vosburg, a mandatory child abuse reporter, called the South Dakota Department of Social Services (DSS), reported the allegations, and requested an immediate investigation. Afterwards, Vosburg spoke with K.P., who attended the same school, and K.P. confirmed that Plumman also had touched her inappropriately. Vosburg explained to P.P. and K.P. that DSS would investigate and told the girls they needed to tell the truth to the investigators.

Later on April 8, a criminal investigator for the Rosebud Sioux Tribe named Grace Her Many Horses (Many Horses) and a DSS child abuse investigator named Beth Valandra-Burnette traveled to the He Dog School to interview the two sisters. The investigators first interviewed P.P., who cried throughout the interview as she told investigators how Plumman would kiss her, fondle her breasts, and touch her vaginal area over her clothes. P.P. told investigators, whenever she resisted Plumman, he would become angry. After completing P.P.'s interview, the investigators interviewed K.P., who told investigators that, from the time she was about eleven years old, Plumman had fondled her breasts, forced his penis into her vaginal area, and rubbed his penis in her vaginal area and between her legs. K.P. also cried during her interview and was unable to tell investigators whether Plumman had

penetrated her or ejaculated. K.P. told investigators Plumman had instructed her not to tell anyone about their secret.

Based on the information obtained from the interviews, the investigators determined the girls were not safe in their home, and DSS took custody of the girls, eventually placing them with their maternal aunt. After taking protective custody of the girls, the investigators went to Plumman's house to take protective custody of the two younger siblings and to explain to Plumman why the children were being removed from the home. At trial, Many Horses described Plumman's demeanor as being angry when she removed the younger siblings from the home, and also testified Plumman asked her what was going to happen now. The following day, the tribal court entered a temporary emergency custody order.

Two days later, the FBI office in Pierre, South Dakota, received a summary from DSS regarding the allegations against Plumman as well as a notice of allegation from Rosebud Sioux Tribal Law Enforcement. On April 18, FBI Special Agents Kevin McGrane (Agent McGrane) and Mike McRoden (Agent McRoden) drove to Plumman's house, arriving at 10:40 a.m. Agent McGrane knocked on the door. When Plumman eventually appeared, Agent McGrane showed his identification and told Plumman he would like to talk with him about P.P. and K.P. Agent McGrane advised Plumman he was not under arrest and he would not be arrested when the agents were done talking with him. Plumman agreed to talk with the agents. After dressing, Plumman walked outside and entered the front passenger seat of Agent McGrane's Ford Expedition, which was parked in the driveway of this residential area. Agent McRoden sat directly behind the driver's seat. Agent McRoden was present throughout the entire interview, but he did not ask questions, except for one question during the summary taping at the end of the interview.

Agent McGrane interviewed Plumman for an estimated three and one-half hours. Throughout the first two hours of the interview, Plumman denied having any

-4-

sexual contact with either P.P. or K.P. However, during the last hour of the interview, Plumman made incriminating admissions. When Agent McGrane told Plumman the girls had made repeated allegations that Plumman sexually abused them, Plumman responded, "if they're saying that, it must have happened." Plumman admitted to having sexual intercourse with K.P. eight or nine times during the previous eight months and three or four times with P.P. during the preceding six months before the FBI interview. Plumman denied digitally penetrating either girl and also denied engaging in anal intercourse with K.P. At the end of the FBI interview, Agent McGrane asked Plumman if he would make either a written or tape-recorded statement. Plumman agreed to make a taped statement, which lasted approximately four minutes. Plumman then exited the Expedition and returned to his house.

On the same day as the FBI interview, a tribal criminal complaint was filed against Plumman alleging two counts of rape and two counts of sexual contact with a minor. On April 23, Plumman was arrested by tribal authorities, appeared in tribal court, and was housed at the Rosebud Sioux Tribe Law Enforcement Center. A month later, on May 22, a federal grand jury indicted Plumman on seventeen counts of aggravated sexual abuse and sexual abuse of a minor. Two weeks later, on June 4, Agent McGrane drove to the Rosebud Sioux Tribe Law Enforcement Center, took custody of Plumman, served him with copies of the federal indictment and arrest warrant, and transported Plumman to Pierre, South Dakota, for his federal arraignment. After Plumman entered the vehicle, Agent McGrane told Plumman he was not going to interview him about the allegations contained in the indictment, and if Plumman had any questions about the federal charges, he should wait and consult a lawyer. Approximately twenty-five minutes into the drive from Rosebud to Pierre, after reviewing the indictment, Plumman exclaimed, "What! I didn't humiliate them, they wanted it."

## B.    Procedural Summary

Plumman moved to suppress incriminating statements he made to FBI agents on April 28 and June 4. The magistrate judge[2] found Plumman was not in police custody on April 28, but made the statements "voluntarily . . . during the course of non-custodial interrogation so that <u>Miranda</u> warnings were not required and such statements were not obtained in violation of his Fifth and Sixth Amendment rights." The magistrate judge determined that, although Plumman was in police custody on June 4, his remarks "were voluntary and not [made] in response to interrogation and that the same were elicited in compliance with the Fifth and Sixth Amendments." The magistrate judge further found Plumman had "volunteered information about his sexual exploits with K.P. and P.P." Adopting the recommendation of the magistrate judge, the district court denied Plumman's motion to suppress the statements.

Plumman proceeded to trial on February 17-20, 2004. K.P. and P.P. testified at trial, as did their mother, Sandra. Plumman also took the stand, testifying he never sexually abused the girls, and contending K.P. and P.P. lied about the sexual abuse allegations because they were angry at Plumman for making them do chores, and because Plumman had threatened to tell Sandra that K.P. and P.P. had been involved sexually with boys. The jury convicted Plumman of sixteen counts, but acquitted him of Count VII, which charged Plumman with aggravated sexual abuse of P.P., while she was under the age of twelve. On May 3, the district court sentenced Plumman to a mandatory life sentence on each of Counts I through VI, and 180-month sentences on each of Counts VIII through XVII, all to be served concurrently.

---

[2]The Honorable Mark A. Moreno, United States Magistrate Judge for the District of South Dakota.

## II.  DISCUSSION

On appeal, Plumman alleges the district court committed multiple errors, including (1) denying the motion to suppress statements, (2) denying Batson challenges of two prospective jurors, (3) admitting prejudicial Rule 404(b) evidence at trial, (4) denying the motion for judgment of acquittal, (5) not grouping his offenses of conviction for sentencing purposes, (6) applying sentencing enhancements without sufficient proof, and (7) imposing a sentence under the Sentencing Guidelines in violation of the Sixth Amendment.  We address these claimed errors below.

### A.  Motions to Suppress Statements

Plumman contends the government violated his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel when the FBI interrogated him during the pendency of tribal charges arising out of the same allegations that Plumman sexually abused two minors.  We review a denial of a suppression motion under a two-pronged standard–the district court's findings of fact are reviewed for clear error, and its legal conclusions are reviewed de novo.  United States v. Sheikh, 367 F.3d 756, 762 (8th Cir. 2004).

#### 1.  Fifth Amendment Claim

On direct appeal, we conduct an independent review of "in custody" determinations to decide whether Fifth Amendment Miranda warnings were required.  Id.  In United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990), we outlined general indicia of custody to assist fact finders in determining whether a suspect is in custody: (1) whether law enforcement informed the suspect the questioning was voluntary, and the suspect was free to leave and was not under arrest; (2) whether the suspect had unrestrained freedom of movement during the questioning; (3) whether the suspect contacted the authorities or voluntarily agreed to official requests to answer questions; (4) whether law enforcement employed strong-arm tactics or deceptive stratagems during questioning; (5) whether the atmosphere of the

interrogation was police dominated; or (6) whether law enforcement placed the suspect under arrest at the end of questioning.

The district court determined Plumman was not in custody on April 18, 2003, and Miranda warnings were not required. After reviewing the suppression transcript and the Report and Recommendation, we conclude the magistrate judge correctly applied the Griffin indicia in determining Plumman was not in custody. Agent McGrane told Plumman in his home the agents were interested in talking with Plumman about K.P. and P.P., Plumman was not under arrest, and Plumman would not be arrested after the interview. Once Plumman was seated in the front passenger seat of Agent McGrane's vehicle, Agent McGrane told Plumman he did not have to talk if he did not want to, and if he decided to talk with the agents, he could stop talking at anytime and exit the truck. Despite these warnings, Plumman agreed to talk with the agents and, throughout the interview, Plumman never refused to answer questions or requested to leave the vehicle.

The magistrate judge noted Agent McGrane did not employ strong-arm or deceptive tactics during the interview, but instead used permissible small talk and rapport-building techniques to make Plumman more comfortable with the difficult subject matter and to gain Plumman's trust and goodwill. The magistrate judge noted the interview, to some extent, was police dominated because there were two FBI agents inside the vehicle. Agent McGrane sat in the driver's seat, while Agent McRoden sat directly behind the driver's seat. During the interview, Plumman was not handcuffed or otherwise physically restrained. The magistrate judge also noted Agent McGrane's unlocked vehicle was parked in Plumman's driveway in a residential neighborhood during the daytime in full view of passing traffic. Agent McGrane testified that, although armed, neither he nor Agent McRoden displayed their firearms, and no other weapons were visible inside the vehicle.

The FBI interview lasted a considerable period of time, an estimated three and one-half hours without intervening breaks. Agent McGrane testified Plumman never requested a meal or bathroom break and never asked to stretch his legs. At the end of the interview, Agent McGrane asked Plumman if he would make either a taped oral statement or a written statement. Plumman agreed to allow the agents to tape his oral statement, which lasted approximately four minutes. Plumman then asked the agents a few procedural questions before he exited the vehicle and returned to the house. Importantly, the magistrate judge noted Plumman was not arrested following the FBI interview. Balancing the Griffin factors, the magistrate judge determined Plumman was not in custody on April 18, 2003, and his statements were voluntary. We agree.

Turning next to consider Plumman's June 4 statement made while Agent McGrane was transporting Plumman to Pierre, South Dakota, the magistrate judge recognized that, although Plumman was clearly in police custody, he was not being interrogated, and his statement was voluntary. Plumman attributes sinister motives to Agent McGrane's act of handing Plumman copies of his federal indictment and arrest warrant, arguing Agent McGrane's purpose in giving Plumman these documents was a deliberate attempt to elicit incriminating statements from him. Plumman contends he was well aware of the information contained in these documents, because he was already under tribal arrest for "the same thing" and had spoken to Agent McGrane six weeks earlier about "the factual circumstances." Notwithstanding these claims, the record contains no evidence establishing Plumman knew before Agent McGrane met him at the Tribal Law Enforcement Center that a federal grand jury had indicted him on seventeen counts of aggravated sexual abuse and sexual abuse of a minor, and a federal warrant had been issued for his arrest. Moreover, when Agent McGrane interviewed Plumman on April 18, Agent McGrane may have discussed all of the underlying facts upon which the federal indictment was based, but a grand jury had not yet indicted Plumman nor had an arrest warrant been issued. Thus, on the morning of April 18, Plumman could not have known, although

he may have suspected, he would be indicted and arrested on federal criminal charges.

Agent McGrane's act of giving Plumman copies of the federal indictment and arrest warrant was, under the circumstances, entirely proper. Plumman had a right to be apprised of why he was being taken into federal custody and transported to Pierre, and on what federal charges he had been indicted. Moreover, Plumman uttered his incriminating remark some twenty-five minutes after receipt of the documents, effectively negating any inference Agent McGrane's act of giving Plumman the documents prompted Plumman to make the incriminating statements.

### 2.    Sixth Amendment Claim

Plumman also argues his statements must be suppressed because the government violated his Sixth Amendment right to counsel. Because tribal criminal charges were filed against Plumman on April 18, 2003, the same day the FBI agents interviewed him, Plumman contends his right to counsel had attached and was violated when FBI agents interviewed him without the presence of counsel. Plumman further claims qualifying judicial proceedings in the Rosebud Sioux Tribe Children's Court (Children's Court) had been initiated against him as early as April 9, 2003. In support of his Sixth Amendment arguments, Plumman cites United States v. Fellers, 540 U.S. 519 (2004), and United States v. Red Bird, 287 F.3d 709 (8th Cir. 2002).

The Supreme Court reiterated in Fellers its longstanding rule that the Sixth Amendment right to counsel attaches "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Fellers, 540 U.S. at 523 (quoting Brewer v. Williams, 430 U.S. 387, 398 (1977) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)). The Court explained "an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he

had been indicted and in the absence of his counsel.'" Id. (quoting Massiah v. United States, 377 U.S. 201, 206 (1964)) (alterations in original).  In Fellers, the Supreme Court concluded there was "no question that the officers in this case 'deliberately elicited' information from petitioner[,]" and "[b]ecause the ensuing discussion took place after the petitioner had been indicted, outside the presence of counsel, and in the absence of any waiver . . . the Court of Appeals erred in holding that the officers' actions did not violate the Sixth Amendment."  Id. at 524-25.

In Red Bird, we outlined the legal principles announced in Brewer and Massiah and applied them to the facts as follows:

> At the time that Red Bird was interviewed, he had been indicted and had been appointed an attorney who was licensed to serve him in both tribal and federal court.  Tribal authorities informed [the FBI agent] of the tribal indictment and the possible violation of federal law. [The FBI agent] then worked in tandem with the tribal criminal investigator to deliberately elicit information from Red Bird, knowing that Red Bird had been indicted in an adversarial proceeding for the same charge and that Red Bird was represented by an attorney on that charge. *This is not a case where the federal agent was unaware of the tribal charge or unaware of the defendant's representation by counsel.*  Rather, it is a case where two sovereigns worked together to investigate conduct that violates the laws of both.

Red Bird, 287 F.3d at 714 (emphasis added).  We conclude Red Bird is inapposite to this case, precisely because "[t]his is . . . a case where the federal agent was unaware of the tribal charge."  Id.

Although the record establishes tribal criminal charges were filed sometime on Friday, April 18, 2003, the record does not establish whether the tribal criminal charges were filed before or after the mid-morning FBI interview.  Nor does the record indicate whether the FBI agents or Plumman knew, at the time their mid-morning interview was conducted, tribal criminal charges had been filed against

Plumman. Tribal authorities did not arrest Plumman on tribal charges until the following Tuesday, April 22, and Plumman did not appear in tribal court until April 23. The temporal delay between the filing of tribal criminal charges and Plumman's subsequent arrest, while not dispositive, makes it more plausible the tribal charges were filed either during, or more likely, after the FBI agents completed the interview.

The district court correctly ruled the pending temporary custody case in the Children's Court was a civil proceeding. "The protections provided by the Sixth Amendment are explicitly confined to 'criminal prosecutions.'" Austin v. United States, 509 U.S. 602, 608 (1993) (citing United States v. Ward, 448 U.S. 242, 248 (1980)). Although Plumman may have been entitled under the tribal constitution to be represented by counsel during the temporary custody proceeding, Plumman had not appeared in the Children's Court, nor had he retained counsel or been appointed counsel before FBI agents requested Plumman's consent to an interview. Accordingly, the district court properly denied Plumman's motion to suppress his voluntary, non-custodial statements to Agents McGrane and McRoden.

### B. Batson Challenge

Plumman asserts the government struck two prospective Native American jurors, and, in doing so, violated Plumman's equal protection rights. The Supreme Court has articulated a three-part test for determining whether a prosecutor racially discriminated in exercising peremptory challenges against prospective jurors in violation of the Equal Protection Clause. Batson v. Kentucky, 476 U.S. 79, 96-98 (1986). First, Plumman must establish the voir dire supports an inference of discriminatory purpose in the prosecutor's exclusion of a prospective juror through a peremptory challenge based on race. See Powers v. Ohio, 499 U.S. 400, 411-16 (1991) (clarifying Batson). Second, if Plumman makes a prima facie showing of racial discrimination, then the prosecutor must offer a racially neutral explanation for the challenge. Batson, 476 U.S. at 97. Third, the trial court must determine whether Plumman establishes purposeful racial discrimination. Id. at 98.

During voir dire, the prosecutor exercised two peremptory challenges against two prospective jurors, K.C. and J.C.W. After the prosecutor struck K.C., Plumman asserted the government had improperly challenged the prospective juror based on her Native American race. The prosecutor and district judge both expressed doubts that K.C. is a Native American, and the prosecutor noted K.C. might be married to a Native American. However, the prosecutor, assuming a valid <u>Batson</u> challenge, explained to the court that he exercised a peremptory strike against K.C. because she knew several of the witnesses named on the witness list, she and her family members have a reputation of being "radical," and the prosecutor suspected K.C. had some relationship with a convicted drug dealer. For purposes of the challenge, the district court assumed K.C. is a Native American, and then rejected the <u>Batson</u> challenge against K.C., determining the government met its burden of articulating several non-discriminatory reasons for exercising its challenge against K.C. and finding Plumman failed to establish purposeful discrimination.

The prosecutor also exercised a peremptory challenge against J.C.W., whom the prosecutor conceded is a Native American female. The district court assumed the challenge of J.C.W. would be subject to a <u>Batson</u> challenge. The prosecutor explained his decision to exercise a peremptory challenge against J.C.W. was based on her previous conviction for assault with a dangerous weapon. The prosecutor further noted, throughout the voir dire examination, J.C.W. wore her sunglasses, sat with her arms folded in front of her, and was unresponsive to the prosecutor's questions concerning prospective jurors' relations with the government and their prior prosecutions. The district court denied the <u>Batson</u> challenge, finding the prosecutor articulated "a nonracial discriminatory reason," and Plumman failed to establish purposeful discrimination.

Assuming for purposes of appeal that K.C. and J.C.W. are both Native Americans, we agree with the district court's conclusion that the prosecutor

-13-

articulated multiple, non-discriminatory reasons for exercising peremptory challenges against both K.C. and J.C.W. Thereafter, the district court gave Plumman's counsel an opportunity to establish purposeful discrimination, which he was unable to do. Therefore, we conclude the district court committed no error in rejecting both <u>Batson</u> challenges.

### C.     Rule 404(b) Evidence

Plumman also objects to the district court's admission of evidence at trial that Plumman physically assaulted Sandra, K.P., and P.P. "We review de novo the district court's interpretation and application of the rules of evidence, and review for an abuse of discretion the factual findings supporting its evidentiary ruling." <u>United States v. Smith</u>, 383 F.3d 700, 706 (8th Cir. 2004) (citing <u>United States v. Blue Bird</u>, 372 F.3d 989, 993 (8th Cir. 2004)). "[W]e will reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." <u>United States v. Brown</u>, 148 F.3d 1003, 1009 (8th Cir. 1998). In balancing the prejudicial effect and probative value under Rule 403, we give great deference to the district court's determination. <u>United States v. Ruiz-Estrada</u>, 312 F.3d 398, 403 (8th Cir. 2002).

"Because Rule 404(b) is a rule of inclusion, we presume that evidence of 'other crimes, acts, or wrongs' is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, unless the party seeking its exclusion can demonstrate that it serves only to prove the defendant's criminal disposition." <u>Smith</u>, 383 at 706. If other bad acts evidence is relevant to a material issue, and the bad acts are both similar to and reasonably close in time to the charged offenses, then the evidence is admissible. <u>Id.</u>

Evidence that Plumman physically abused both minor girls and their mother provides a context for the sexual abuse and a cogent explanation for the girls' failure to report the sexual abuse for almost two years. See <u>United States v. Powers</u>, 59 F.3d

-14-

1460, 1465-66 (4th Cir. 1995). The physical assault evidence was temporally related to the evidence of sexual abuse and also provides a reason why Sandra did not contact law enforcement, but instead instructed P.P. to contact the school counselor, if Plumman's unwanted touching continued. See United States v. Bruguier, 161 F.3d 1145, 1151 (8th Cir. 1998); Powers, 59 F.3d at 1465 (concluding "evidence of the beatings makes it more probable that [victim] failed to report the sexual abuse not because it never took place, but because of her fear of retribution"). The bad acts evidence was obviously prejudicial to Plumman. However, the district court mitigated any undue prejudice by admitting the evidence for the limited purpose of showing K.P. and P.P. were afraid of Plumman, and by giving the jury a proper limiting instruction. United States v. Harris, 324 F.3d 602, 607 (8th Cir. 2003) (finding instruction cured any unfair prejudice of 404(b) evidence). Because the challenged evidence was probative to demonstrate the "culture of coercion" that existed within the girls' home, we conclude the limited evidence of Plumman's prior acts of physical abuse against Sandra, K.P., and P.P. was relevant to the issue of Plumman's guilt, and the district court did not abuse its discretion. See Powers, 59 F.3d at 1467 (declaring "violent acts of physical abuse, when combined with the fear generated by those actions, comprise the factual context of the sexual abuse in this case").

### D. Motion for Judgment of Acquittal

Plumman contends the district court erred in denying his motion for judgment of acquittal. Plumman argues the evidence adduced at trial was legally insufficient for a jury to find beyond a reasonable doubt "Plumman had engaged in a particular sex act with a particular girl at the particular time when that girl was either older or younger than 12 years." We review de novo the sufficiency of the evidence, view the evidence in the light most favorable to the government, resolve conflicts in the government's favor, and accept all reasonable inferences that support the verdict. Sheikh, 367 F.3d at 763. "[T]his standard of review is strict," id., and "[r]eversal is appropriate only where a reasonable jury could not have found all the elements of the

offense[s] beyond a reasonable doubt," United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002).

Counts I through III alleged, between October 9, 2000 and October 8, 2001, Plumman engaged in sexual intercourse, digital penetration, and sexual abuse with K.P., while she was under the age of twelve. K.P. testified at trial that, when she was eleven years old, Plumman inserted his fingers into her "private area," had sexual intercourse with her "twenty times," and touched her breasts and "private area." Similarly, Counts IV through VI, alleged, between October 20, 2001 and October 19, 2002, Plumman engaged in sexual intercourse, digital penetration, and sexual abuse with P.P., while she was under the age of twelve. P.P. testified that, beginning when she was age ten, Plumman touched her private area under her clothing , penetrated her private areas with his finger, and had sexual intercourse with her.

Counts VIII through XV alleged multiple instances of penis-to-vulva contact between Plumman and K.P. during the period from August 1, 2002 to April 8, 2003, when K.P. was twelve years or older. K.P. testified that, when she was eleven to thirteen years old, Plumman had sexual intercourse with her more than twenty times. On cross examination, K.P. testified that Plumman had sexual relations with her two to three times per week over two years, or more than two hundred times. Finally, Counts XVI and XVII alleged two instances of penis-to-vulva contact between Plumman and P.P., when P.P. was twelve years old. P.P. testified at trial that, when she was twelve, Plumman's "private part" touched her "private part" and the unwanted contact continued until P.P. told the school counselor on April 8, 2003. On cross-examination, P.P. testified the penis-to-vulva contact occurred "maybe two times a week" over a two-year period.

After reviewing the trial testimony of K.P. and P.P., we are persuaded the government adduced more than sufficient evidence from which a reasonable jury could find Plumman guilty beyond a reasonable doubt of Counts I through VI and

-16-

Counts VIII through XVII.  Interestingly, the jury acquitted Plumman of Count VII, which alleged mouth-to-vulva contact between Plumman and P.P.  At trial, P.P. testified Plumman put his mouth on her "private area" "three or more than three" times.  However, during a skillful cross-examination, P.P. admitted she never told Many Horses in April 2003, that Plumman had put his mouth on her "private part." P.P. also admitted on cross-examination that she had noted in her therapy journal that Plumman "had licked me on my bottom," even though she denied at trial that Plumman had ever done so.  The jury's acquittal on Count VII further convinces us the jury carefully weighed all of the evidence, and took seriously its duty not to convict Plumman of counts the government did not prove beyond a reasonable doubt. We find no basis for disturbing the jury's reasoned verdict.

### E.    Grouping of Counts

Plumman urged the district court to group for sentencing purposes the aggravated sexual abuse counts involving K.P. (Counts I-III) and the aggravated sexual abuse counts involving P.P. (Counts IV-VI).  The district court declined, explaining:

> The Counts should not be grouped because the defendant is and has been convicted of different sexual acts and assaults on different days, in fact, almost repeatedly.  And, so, the victims here were not harmed by a single injury, but were harmed on numerous occasions by several different sexual acts over a lengthy period of time.  And, so, it would not be appropriate to group them.

Section 3D1.2 of the Sentencing Guidelines provides: "All counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2.  Application note 4 explains counts are to be grouped when they are "part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim."  Id. § 3D1.2, cmt. n.4.  Note 4 also instructs "two counts of rape for raping the same person on different days . . . are not to be

grouped together." Id. As the Second Circuit recently declared, multiple "episodes of sexual misconduct that society has legitimately criminalized occurring with the same person on different days are not 'substantially the same harm' for purposes of section 3D1.2." United States v. Vasquez, 389 F.3d 65, 77 (2d Cir. 2004). See also United States v. Big Medicine, 73 F.3d 994, 997 (10th Cir. 1995) (concluding multiple "acts of criminal sexual abuse are excluded from being grouped"). We readily conclude the district court properly declined to group separate acts of sexual abuse occurring between Plumman and K.P. (Counts I-III) and between Plumman and P.P. (Counts IV-VI), which occurred on different dates.

### F.     Sentencing Enhancements

Plumman also objects to the district court's application of section 2A3.1(b)(1) of the Sentencing Guidelines, which allows a district court to enhance a base offense level by four levels if the offense was committed by force or threat or other means as defined in 18 U.S.C. § 2241(a) or (b). Citing Blakely v. Washington, 124 S. Ct. 2531 (2004), Plumman contends the district court's sentencing findings, based on a preponderance of the evidence, which supported a force enhancement pursuant to section 2A3.1(b)(1), and a custody, care or supervision enhancement pursuant to section 2A3.1(b)(3)(A), coupled with the court's acceptance of the Presentence Investigation Report's finding that Plumman engaged in a pattern of sexual activity involving prohibited sexual conduct pursuant to section 4B1.5(b)(1), contravened his Sixth Amendment right to a jury trial. The government argues the force and custody enhancements are supported by sufficient evidence. The government further argues Plumman, at sentencing, failed to raise either a Fifth Amendment Due Process Clause challenge or a Sixth Amendment right to a jury trial challenge.

The Supreme Court has held the mandatory Sentencing Guidelines scheme is unconstitutional. United States v. Booker, 125 S. Ct. 738 (2005). The Guidelines are now "effectively advisory." Id. at 743, 757. Although Plumman objected to the sentencing enhancements, his objections were not based on a Sixth Amendment

challenge, nor did he make specific reference to <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000), or <u>Blakely</u>. Therefore, we review Plumman's <u>Booker</u> challenge only for plain error. <u>United States v. Pirani</u>, 406 F.3d 543 (8th Cir. 2005) (en banc). "Plain error is error that is 'plain' (that is, clear or obvious), 'affects substantial rights' (that is, prejudicial) and 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" <u>United States v. Rashid</u>, 383 F.3d 769, 775 (8th Cir. 2004) (citing <u>United States v. Olano</u>, 507 U.S. 725, 732-37 (1993)). <u>See</u> <u>also</u> <u>Johnson v. United States</u>, 520 U.S. 461, 467 (1997).

The first two <u>Olano</u> factors are satisfied because "[t]he district court (understandably) committed <u>Booker</u> error by applying the Guidelines as mandatory, and the error is plain." <u>Pirani</u>, 406 F.3d at 550. In determining whether plain error has affected substantial rights, we focus on "what sentence would have been imposed absent the error." <u>Id.</u> at 551. The third prejudice factor "turns on whether [Plumman] has demonstrated a reasonable probability that he would have received a more favorable sentence with the <u>Booker</u> error eliminated by making the Guidelines advisory." <u>Id.</u>

In imposing the mandatory life sentences, the district judge stated:

> I do agree with [defense counsel] that this–that a life sentence is too severe for this defendant under even all the facts of this case as bad as they are. *And I would not impose a life sentence but for the sentencing guidelines.* But . . . it makes no difference what I think. I think that the sentencing guideline as it's applied here is too harsh. I would sentence Mr. Plumman to a period of less than life if it were up to me . . . . If I were to downwardly depart in this case I would be reversed before the ink was dry.

(emphasis supplied). This judicial proclamation confirms that, at the time of Plumman's sentencing, the district court believed it was required to impose concurrent life sentences for Counts I through VI as mandated by the Guidelines. <u>See</u>

-19-

United States v. Collins, 340 F.3d 672, 683 (8th Cir. 2003) (holding life sentence mandatory under 21 U.S.C. § 841(b), and district court could not depart from the mandatory life sentence, unless government made a motion). Our review leads us to conclude a reasonable probability exists that, under an advisory Guidelines regime, the district court would have sentenced Plumman to a term of years and not to life on each of Counts I through VI. Therefore, Plumman has carried his burden of establishing prejudicial error.

The fourth Olano factor requires us to consider whether the "plain error" at sentencing "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 734-37 (internal quotation and citation omitted). In Pirani, we recognized "the possibility that there may be plain Booker errors that meet the third Olano factor but not the fourth." Pirani, 406 F.3d at 554. A Booker error does not result in an illegal sentence; rather, the process used in arriving at the sentence is illegal. Id. In analyzing the fourth factor, Pirani relied on the Supreme Court's reasoning in United States v. Cotton, 535 U.S. 625, 632 (2002), a case in which the defendants claimed the district court violated Apprendi by imposing a sentencing enhancement based on a drug quantity not contained in the indictment. In conducting plain-error review, the Supreme Court ruled, "even assuming respondents' substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings," id at 632-33, because "[t]he evidence that the conspiracy involved at least 50 grams of cocaine base was 'overwhelming' and 'essentially uncontroverted,'" id. at 633. In determining the fourth factor was not met, the Supreme Court reasoned "[t]he real threat then to the 'fairness, integrity, and public reputation of judicial proceedings' would be if respondents . . . were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial." Cotton, 535 U.S. at 634.

This case involves <u>Booker</u> sentencing error, which, unlike the <u>Apprendi</u> error raised in <u>Cotton</u>, might alter Plumman's sentences under an advisory Guidelines scheme, without rendering disproportionate sentences that run afoul of Congressional intent. <u>See</u> <u>id.</u> Based on the record, objective consideration of the 18 U.S.C. § 3553(a) factors on remand might warrant the district court departing downward from the applicable Guidelines range. Based on the district court's comments at sentencing, the district court more than likely would not have imposed life sentences on Counts I through VI under an advisory Guidelines scheme. Under these circumstances, affirming the life sentences would "seriously affect[] the fairness, integrity, or public reputation of the judicial proceedings." <u>Johnson</u>, 520 U.S. at 467; <u>United States v. Rodriquez-Ceballos</u>, 2005 WL 1131672, at *5 (8th Cir. May 16, 2005); <u>see also United States v. Trujillo-Terrazas</u>, 405 F.3d 814, 821 (10th Cir. 2005).

Because Plumman met his high burden of proving actual substantial prejudice by establishing a reasonable probability the district court would have imposed more favorable sentences on Counts I through VI under an advisory Guideline regime, we exercise our discretion, <u>Johnson</u>, 520 U.S. at 467, to vacate Plumman's mandatory life sentences on these counts. We therefore remand this case to the district court for resentencing on Counts I through VI consistent with <u>Booker</u> and this opinion. However, nothing in this opinion should be construed as suggesting more lenient sentences on Counts I through VI are necessarily warranted or would be reasonable. The district court must conduct its resentencing analyses in the first instance.

## III.  CONCLUSION

We affirm Plumman's convictions on all counts and the district court's sentences on each of Counts VIII through XVII. We vacate Plumman's mandatory life sentences on each of Counts I through VI and remand to the district court for resentencing on these six counts under the advisory Guidelines in light of <u>Booker</u>.

_____